UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

IMANI BROWN,

                                                      Plaintiff,

-against-

THE CITY OF NEW YORK, a municipal entity; and New York City Police Officers JUSTIN NAIMOLI (shield #26063) and THEODORE PLEVRITIS, in their individual capacities,

                                                     Defendants.

**DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACT**

**13 CV 1018 (KBF)**

------------------------------------------------------------------------------x

Defendants City of New York, Justin Naimoli and Theodore Plevritis, by their attorney Zachary Carter, Corporation Counsel of the City of New York, submit this statement pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, setting forth the material facts to which they contend there is no genuine issue to be tried.

1. On November 15, 2011, plaintiff attended an event at Blue Stocking Café in Manhattan. (Exhibit B, 20: 10-15; Exhibit F, 24-25).

2. At Blue Stocking Café one of plaintiff's friends received a text message that Occupy was being evicted from Zuccotti Park. (Exhibit B, 21-22; Exhibit F, 23-24).

3. Plaintiff felt it was important to witness the activity at the park that evening. (Exhibit B, 21-22; Exhibit F, 28: 12-13).

4. Plaintiff decided to proceed to Zuccotti Park. (Exhibit B, 19: 2-8; Exhibit F, 28: 18-20).

5. Plaintiff intended to observe the activity in Zuccotti Park. (Exhibit B, 21: 18-21).

6. Plaintiff arrived in the vicinity of Zuccotti Park at approximately 2:00 a.m. (Exhibit B, 19: 2-20; Exhibit F, 28; 18-24)

7. On arriving in the vicinity of Zuccotti park plaintiff observed the eviction of the park, interacted with passersby, and read poetry. (Exhibit F, 34: 6-9).

8. At approximately 5:00 a.m. plaintiff and Johnny Sagan left the vicinity of Zuccotti Park to find a bathroom. Sagan intended to go home after plaintiff found a bathroom. (Exhibit B, 24: 15-23; Exhibit F, 34-35; Exhibit I, 20-21).

9. Plaintiff saw a Starbucks with a light on and people inside and approached, hoping to use the bathroom. (Exhibit B 26: 5-8; Exhibit F 35: 23-25).

10. The Starbucks was closed. (Exhibit B, 26: 5-11).

11. Plaintiff knocked on glass door to the Starbucks with a closed fist and gestured to herself and an employee inside. (Exhibit F, 36: 9-14, 37: 20-25, 38: 3-9).

12. A female employee approached the door, opened it, and told Plaintiff that the store was closed. The female employee then walked away. (Exhibit F, 36: 11-23, 38: 10-12, 39: 13-17).

13. Plaintiff realized that she did not know when the Starbucks was going to open and began to knock on the door again, for a bit longer than the first time. (Exhibit F, 38: 13-20).

14. Plaintiff's voice was elevated as she knocked on the door. (Exhibit F, 58-59).

15. The female employee returned to the door, opened it, and stated that the Starbucks was closed, and plaintiff could not use the bathroom. Plaintiff asked what time the store opened, and was told 5:30 (Exhibit B, 26-27, Exhibit F, 38-39).

16. Plaintiff decided to wait in front of the Starbucks until the store opened. (Exhibit B, 27: 12-21).

17. After Plaintiff's second conversation with the Starbucks employee at least one other individual arrived. That individual also decided to wait in front of the store until it opened. (Exhibit F, 37: 4-10, 39: 18-21, 40: 10-12).

18. Plaintiff does not recall anyone other than Sagan, herself and the third individual who arrived separately in front of the sidewalk prior to the police arriving. (Exhibit F 40: 13-21).

19. Plaintiff did not see anyone else knocking or banging on the door to the Starbucks prior to the police arriving. (Exhibit F, 40-41).

20. At 5:05 a.m. on November 15, 2011, a call was placed to 911 by Starbucks Assistant Manager Ismael Torres. (Exhibit H, 9: 1-5; Exhibit J, Exhibit O).

21. Torres states in that call "I have some people knocking on the door really really bad trying to get in the store to use the bathroom – and they like – you know, making nasty comments. And I can't op-open like this." (Exhibit J, 00:20-00:35).

22. Torres stated again that the individuals knocking on the door were not letting the store open, and that the store could not open at 5:30. (Exhibit H, 12: 15-17; Exhibit J, 00:50-00:58).

23. Torres told the operator that 6 individuals were knocking on the door. (Exhibit H, 11: 15-17; Exhibit J, 00:33-00:38).

24. Torres described the individuals knocking as really aggressive and angry. He also felt concerned for the safety of employees coming in to work. (Exhibit H, 12: 15-20, 41: 4-9).

25. Torres told the individuals knocking that he was calling 911, and was visible while on the phone. He describes the group at that point as very aggressive and cursing. (Exhibit, 12-13; 13: 2-8).

26. Torres was concerned that the doors might be forced open. (Exhibit H, 13-14).

27. Officer Naimoli and Plevritis were assigned to sector "EFG" and designated as unit 1E or "1 Eddie" on the radio. (Exhibit K; Exhibit O; Exhibit Q).

28. At 5:05 the 911 call was relayed to Officer Naimoli and Plevritis by the dispatcher. (Exhibit G, 73-74; Exhibit K 00:02-00:08, 05:22-05:45; Exhibit O; Exhibit Q).

29. The dispatcher informed the officers of the 911 call stating in part, "six people banging on the doors refusing to leave at Starbucks coffee." (Exhibit K, 05:36-05:42).

30. Within approximately 10 minutes of plaintiff and Sagan's arrival at the Starbucks and five to ten minutes after Plaintiff's last interaction with the Starbucks employee the police arrived. (Exhibit B, 27: 7-11; Exhibit F, 41: 8-14; Exhibit I, 29: 4-9).

31. Officer Naimoli and Plevritis requested the dispatcher call Torres back from inside their patrol car as they arrived. (Exhibit G, 78-79; Exhibit K, 11:03-11:20; Exhibit O).

32. The dispatcher called Torres back twice at approximately 5:12. The first time, she received voicemail, the second time she spoke briefly with Torres. (Exhibit H, 9:6-23; Exhibit K, 00:02-00:08, 11:15-12:28; Exhibit O).

33. When the dispatcher reached Torres she asked "Ma'am did you call for the police?" Torres responded "Oh yes, they already came." The dispatcher stated "They're outside." Torres responded "I just spoke to them. Thank you dear." (Exhibit H, 9-10; Exhibit K 12:19-12:28; Exhibit O).

34.     The Officer Naimoli and Plevritis arrived at approximately 5:07-5:11 a.m.  (Exhibit G, 75: 11-13, 76: 10-15; Exhibit H, 15: 5-7; Exhibit O).

35.     When Officer Plevritis arrived he saw five to six people standing in front of the Starbucks yelling.  (Exhibit G, 76-78).

36.     Officer Plevritis saw a male inside the Starbucks waving to him and officer Naimoli.  (Exhibit G, 76: 16-21, 78: 8-12).

37.     Officer Plevritis walked past the group of people in front of the Starbucks and approached the individual inside.  (Exhibit G, 78: 13-15; Exhibit H, 15: 11-22).

38.     Officer Plevritis discovered that the individual inside the Starbucks was the complainant, Torres, and spoke to him about why he called 911.  (Exhibit G, 81: 8-10, 86: 18-25, 212: 1-18; Exhibit H, 15-16).

39.     Torres informed Officer Plevritis that he called for the police because the individuals banging and kicking the door made him fearful, and that he was scared they would break the door.  (Exhibit G, 87: 4-19; Exhibit H, 15-16).

40.     Torres indicated the group of people who were knocking on the door as well as plaintiff individually.  (Exhibit G, 87: 4-10, 88: 4-9, 212: 19-25, 213: 2-6, 214: 3-18, 224: 7-18; Exhibit H, 15-16, 11-12, 18: 1-18).

41.     Throughout the interaction between Torres and the police, the group in front of the Starbucks yelled and cursed.  (Exhibit G, 81: 17-23, 83: 4-19; Exhibit H, 16: 19-25, 17: 1-2).

42.     After conferring with Torres, Officers Plevritis and Naimoli ordered the individuals to disperse from the location and proceeded back to their car.  (Exhibit G, 91: 8-23, 92: 2-11, 92-93; Exhibit H,17: 4-6 46: 1-3).

43. Plaintiff recalls approaching Officer Naimoli and Plevritis on the passenger side of their patrol car as they arrived at the Starbucks. (Exhibit B, 29: 23-25, 30: 3-5; Exhibit F, 41: 17-18; Exhibit G, 93: 5-13).

44. Plaintiff never saw the officers go to the door of the Starbucks or speak to a Starbucks employee. (Exhibit F, 46: 20-25).

45. When plaintiff approached the car she asked where she could use the bathroom. The officers did not direct her to a bathroom at that time. (Exhibit B, 30: 13-22; Exhibit F, 42: 4-13; Exhibit G, 93: 16-22).

46. After some conversation, plaintiff was directed to leave the area. (Exhibit B, 32: 12-19; Exhibit F, 43: 12-13; Exhibit G, 94: 7-9, 97: 5-8).

47. Plaintiff decided to wait at the Starbucks. (Exhibit B, 32: 20-23; Exhibit F, 43: 20-22; Exhibit G, 100: 17-23).

48. Plaintiff doesn't recall whether additional individuals had arrived at the Starbucks during her interaction with the police, but Sagan and at least one unidentified female were present. (Exhibit F, 40: 1-15, 44: 1-9, 47: 7-9).

49. After plaintiff decided to wait at the Starbucks the officers exited the car and approached plaintiff. (Exhibit B, 33: 8-19; Exhibit F, 44-45; Exhibit G, 100-101).

50. The officers told plaintiff they had received a call from Starbucks and asked plaintiff for identification. She refused to provide her identification. (Exhibit B, 34: 3-16; Exhibit F, 45-46; Exhibit G, 103: 3-16).

51. Plaintiff asked on what grounds she was being asked for her identification at least one time. (Exhibit B, 34: 14-16; Exhibit F, 48: 6-12).

52.     Officers then told plaintiff to go home.  She replied she could not.  (Exhibit B, 34: 17-21).

53.     Officers then told plaintiff they were going to issue her a citation, but now were going to place her under arrest.  (Exhibit B, 34-35; Exhibit F, 47: 10-14, 48-49; Exhibit G, 103: 20-23).

54.     Officers then grabbed plaintiffs arm to place her under arrest.  (Exhibit B, 35: 8-14; Exhibit F, 48: 15-17, 49: 14-22).

55.     Plaintiff asked repeatedly why she was being arrested and was not offering her arms to be handcuffed.  (Exhibit B, 37: 17-20; Exhibit F, 49: 23-25, 50: 11-21; Exhibit G, 108-109, 110: 9-13, 112: 3-23; Exhibit M, 00:00-00:17).

56.     Prior to the officers taking plaintiff to the ground Sagan stated "Please don't put her on the floor, just please let her go."  Officer Plevritis replied "No, she's under arrest." Officer Plevritis then ordered plaintiff "Stop moving your arms, stop resisting miss, stop resisting.  Miss, stop resisting.  Alright, you're going to the ground now."  (Exhibit M, 00:00-00:17).

57.     After two attempts the officers brought plaintiff to the ground.  (Exhibit B, 37-38; Exhibit F, 51: 15-24; Exhibit M 00:16-00:22).

58.     Sagan has no recollection of events between the time the police arrived until Plaintiff was on the ground.  (Exhibit I, 31: 4-25).

59.     Sagan cannot state whether he was aware of the officers' presence on the scene prior to them having Plaintiff on the ground.  (Exhibit I, 31: 19-22).

60.     When on the ground the officers asked for plaintiff to surrender her hands. (Exhibit F, 52-53).

61.     When on the ground the officers told plaintiff to stop resisting.  (Exhibit F, 53: 3-5).

62.     Plaintiff did not offer her arms in part because she was trying to keep ahold of her phone and wallet, reach for the scattered contents of her purse and was fearful of what would happen to her property.  (Exhibit F, 52: 4-14, 52: 15-20, 53: 9-13).

63.     Plaintiff was pepper sprayed two times prior to being placed in handcuffs.  (Exhibit B, 38: 13-17, 39-41; Exhibit F, 54: 4-8).

64.     After being taken to the ground and prior to being pepper sprayed plaintiff was told to stop resisting fourteen times.  (Exhibit M, 00:22-01:41).

65.     After being taken to the ground and prior to being pepper sprayed plaintiff was told to stop it approximately five times.  (Exhibit M, 00:22-01:41).

66.     After being taken to the ground and prior to being pepper sprayed plaintiff was told to give over her hands.  (Exhibit M, 00:22-01:41).

67.     Prior to being pepper sprayed the first time plaintiff was warned "give us your hands or you're going to get pepper sprayed right now."  (Exhibit G, 129: 13-18; Exhibit M, 01:33-01:43).

68.     Plaintiff does not recall whether she was warned prior to being pepper sprayed the first time.  (Exhibit B, 38: 21-23; Exhibit F, 54: 14-17)

69.     Plaintiff was pepper sprayed for less than one second the first time.  (Exhibit M, 01:48)

70.     At 5:13 a.m., while struggling with plaintiff, Officer Plevritis requested assistance over the radio.  (Exhibit K, 00:02-00:08, 13:32-13:40; Exhibit M, 00:43-00:49; Exhibit O).

71. After plaintiff was taken to the ground and prior to her being pepper sprayed Sagan described the events leading up to plaintiff's arrest: "She wanted to use the bathroom at Starbucks.  She was banging on the door asking them to use their discretion and let her go to the bathroom, and they called the police on her.  The police came here and they were angry at her for –" (Exhibit L; Exhibit M, 01:00-01:20).

72. After being pepper sprayed the first time and prior to being pepper sprayed the second time, plaintiff was told multiple times to stop resisting, and to place her hands behind her back.  (Exhibit M, 01:49-02:13).

73. After being pepper sprayed the first time plaintiff and prior to being pepper sprayed the second time, plaintiff continued to refuse to surrender her hands in part because she was attempting to pull her skirt down.  (Exhibit B, 40-41).

74. Prior to being pepper sprayed the second time, plaintiff was warned "you're going to get it again, you're going to get it again."  (Exhibit M, 02:10-02:13).

75. Plaintiff recalls being warned that she would be pepper sprayed a second time if she did not surrender her hands.  (Exhibit F, 54: 21-24).

76. Plaintiff was pepper sprayed a second time for less than one second.  (Exhibit M, 02:12).

77. After being pepper sprayed a second time plaintiff was ordered to put her hands behind her back multiple times and to stop resisting.  (Exhibit M, 02:12-02:35).

78. Approximately twenty seconds after being pepper sprayed the second time plaintiff offered her arms to the police.  Plaintiff did this because she realized that the only way to move on from the current situation would be to allow herself to be placed in the police car.

Plaintiff also was in physical pain and did not want to be pepper sprayed again.  (Exhibit F, 56: 1-15; Exhibit M, 02:30-02:40).

79.     Plaintiff was never punched by any officer.  (Exhibit F, 57: 3-4).

80.     Plaintiff describes the action the officers used to bring her to the ground as a kick, but other than that, was not kicked by any officer.  (Exhibit F, 57: 5-22).

81.     Officer Plevritis did not believe the group at the Starbucks was part of the Occupy Wall Street movement.  (Exhibit G, 184: 6-25).

82.     Plaintiff was placed in a police car and transported back to the police precinct at approximately 5:24 a.m.  (Exhibit K, 00:02-00:08, 23:50-24:05; Exhibit N; Exhibit O).

83.     Officer Naimoli called for EMS to come to the station for plaintiff at approximately 5:28.  (Exhibit K, 00:02-00:08, 27:45-28:00; Exhibit O).

84.     Plaintiff was transported to the First Police Precinct by Officer Naimoli and Plevritis.  They arrived at the Precinct at approximately 5:28 a.m.  (Exhibit K, 00:02-00:08, 27:45-28:00; Exhibit O; Exhibit Q).

85.     Plaintiff never requested medical treatment.  (Exhibit F, 61: 10-15).

86.     Plaintiff ultimately refused treatment from EMS when it arrived.  (Exhibit F, 62-63; Exhibit P).

87.     Plaintiff still needed to use a bathroom, and asked when she would be able to use one.  She was informed that she could use a bathroom after they were done booking her.  Within twenty minutes of arriving at the police precinct plaintiff was permitted to use the bathroom.  (Exhibit B, 44-45; Exhibit F, 61-62, 63: 16-21).

88.     Plaintiff was taken to central booking, and ultimately arraigned for two charges of disorderly conduct and resisting arrest.  (Exhibit F, 68: 5-11; Exhibit N).

89.     Plaintiff accepted an adjournment in contemplation of dismissal at her second court appearance.  (Exhibit F, 68: 12-24).

Dated:      New York, New York
            February 13, 2014

                                        ZACHARY CARTER
                                        Corporation Counsel - City of New York
                                        *Attorney for Defendants*
                                        100 Church Street
                                        New York, New York 10007
                                        (212) 356-2373

                              By:    /s/
                                        Andrew Lucas
                                        New York City Law Department
                                        Special Federal Litigation Division

TO:

Honorable Katherine B. Forrest
United States District Judge
500 Pearl Street
New York, New York 10007

Honorable Andrew J. Peck
United States Magistrate Judge
500 Pearl Street
New York, New York 10007

Joshua Moskovitz
Beldock, Levine and Hoffman
99 Park Avenue, 16th Floor
New York, NY 10016