**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

IMANI BROWN,

                               Plaintiff,

      -against-

THE CITY OF NEW YORK, a municipal entity; and
New York City Police Officers JUSTIN NAIMOLI
(Shield #26063) and THEODORE PLEVRITIS, in
their individual capacities,

                             Defendants.

-------------------------------------------------------------------- X

No. 13-cv-1018 (KBF)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, 16th Floor
New York, New York 10016
(212) 490-0400

*Attorneys for Plaintiff Imani Brown*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND .....................................................................................................3

LEGAL STANDARD ..............................................................................................8

ARGUMENT ...........................................................................................................9

      I.     The Officers Have Perjured Themselves and Are Not Credible ............................9

      II.    Plaintiff's Arrest Was Unconstitutional ..................................................12

              A.  The officers arrested Plaintiff without probable cause in
                    violation of the Fourth Amendment where they had
                    no information that she had committed any offense
                    when they arrested her ..................................................12

              B.  The force used was excessive in violation of
                    the Fourth Amendment ..............................................17

      III.   First Amendment Retaliation ................................................19

      IV.   Defendants are not Entitled to Qualified Immunity on
              Plaintiff's Federal Claims ..................................................22

      V.    Plaintiff's State Law Claims ..................................................23

              A.    Constitutional claims ..................................................23

              B.    Common law claims ..................................................24

              C.    State law immunity ..................................................24

CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

**STATUTES**                                                        **PAGE**

**State**

N.Y. Criminal Procedure Law § 140.10 .......................................................................... 10, 25

N.Y. C.P.L.R. § 215 ..................................................................................................................24

N.Y. Gen. Mun. Law § 50-i ...................................................................................................24

N.Y. Pen. Law § 10.00 ............................................................................................................17

N.Y. Penal Law § 195.05 ................................................................................................. 15, 16

N.Y. Penal Law § 240.20 ................................................................................................ 7, 10, 14

N.Y. Penal Law § 240.26 .......................................................................................................14

**RULES**

Fed. R. Civ. P. 56 .......................................................................................................................8

**CASES**

**Federal**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) ..................................................8

*Anderson v. City of N.Y.*, 817 F. Supp. 2d 77 (E.D.N.Y. 2011) ............................... 19, 21

*Bancroft v. City of Mt. Vernon*, 672 F. Supp. 2d 391, 401 (S.D.N.Y. 2009) ..............25

*Barnett v. Dillon*, 890 F. Supp. 83 (N.D.N.Y. 1995) ...................................................24

*Bender v. City of N.Y.*, 78 F.3d 787 (2d Cir. 1996) ......................................................24

*Berger v. Schmitt*, 91 F. App'x 189 (2d Cir. 2004) ......................................................16

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93 (2d Cir. 2001) ........................7

*C.G. v. City of New York*, No. 12-cv-1606,
    2013 U.S. Dist. LEXIS 153020 (E.D.N.Y. Oct. 24, 2013) .........................................16

*Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002) .............................................................8

*Graham v. City of N.Y.*, 928 F. Supp. 2d 610, 625 (E.D.N.Y. 2013) .......................................... 25

*Jaegly v. Couch*, 439 F.3d 149 (2d Cir. 2006) ........................................................................ 14

*Kerman v. City of N.Y.*, 374 F.3d 93, 108 (2d Cir. 2004) ......................................................... 22

*Lederman v. Adams*, 45 F. Supp. 2d 259, 269 (S.D.N.Y. 1999) ............................................... 22

*Moore v. Comesanas*, 32 F.3d 670 (2d Cir. 1994) ................................................................. 13

*People v. Baker*, 20 N.Y.3d 354 (2013) .............................................................................. 13, 15

*Posr v. Doherty*, 944 F.2d 91 (2d Cir. 1991) .......................................................................... 24

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) ........................................... 22

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) ............................................... 12, 14

*Rivera v. Rochester Genesee Reg. Transp. Auth.*, 702 F.3d 685 (2d Cir. 2012) ........................... 8

*Tracy v. Freshwater*, 623 F.3d 90 (2d Cir. 2010) ............................................................ 17, 18-19

*Webster v. City of N.Y.*, 333 F. Supp. 2d 184 (S.D.N.Y. 2004) ................................................ 20

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) ................................................................ 9, 12, 13

**State**

*Brown v. State*, 89 N.Y.2d 172 (1996) ................................................................................ 23

*Drake v. City of Rochester*, 96 Misc.2d 86 (1978) ................................................................. 24

*Eckardt v. City of White Plains*, 87 A.D.3d 1049 (2d Dep't 2011) ............................................. 24

*Lyles v. State*, 2 A.D.3d 694, 695 (2d Dept. 2003) ................................................................. 23

*Lyles v. State*, 3 N.Y.3d 396, 401 (2004) ............................................................................. 23

*Martinez v. City of Schenectady*, 97 N.Y.2d 78 (2001) ........................................................... 23

*Matter of Davan L.*, 91 N.Y.2d 88 (1997) ........................................................................ 16, 17

*McCummings v. N.Y. City Transit Auth.*, 81 N.Y.2d 923 (1993). ............................................... 24

*People v. Case*, 42 N.Y.2d 98 (1977) .................................................................................. 17

*People v. De Bour*, 40 N.Y.2d 210, 223 (1976) ....................................................................... 5

*People v. Howard*, 50 N.Y.2d 583 (1980) ........................................................5, 16-17

*People v. Johnson*, No. 43, 2014 N.Y. Slip. Op. 02217 (N.Y. Apr. 1, 2014) ............................ 15

*People v. Lupinacci*, 191 A.D.2d 589, 590 (2d Dep't 1993)................................... 5, 16

*People v. May*, 81 N.Y.2d 725 (1992) ........................................................... 16

*People v. Offen*, 96 Misc. 2d 147 (N.Y. Crim. Ct. 1978)........................................... 16

*People v. Stevenson*, 31 N.Y.2d 108 (1972)...................................................... 19

*Szerlip v. Finnegan*, 77 Misc. 2d 655 (1974), *aff'd*, 47 A.D.2d 603 (2d Dep't 1975) ................ 24

## PRELIMINARY STATEMENT

Plaintiff Imani Brown submits this memorandum in opposition to Defendants' motion for summary judgment.[1]  For the reasons stated herein and Plaintiff's Response to Defendants' Rule 56.1 Statement and Statement of Additional Material Facts, the declaration of Joshua S. Moskovitz, and the evidence annexed thereto, Defendants' motion should be denied.

Imani Brown is a 25-year-old graduate of Columbia University.   Prior to matriculating at Columbia, she resided in New Orleans, Louisiana, with her mother, Jeanne M. Woods, who is the Henry F. Bonura, Jr. Distinguished Professor of Law at Loyola University College of Law. At the time of this incident, Ms. Brown was an Executive Assistant and Board Liaison at the Judd Foundation, which preserves the work of the late American artist Donald Clarence Judd.

Ms. Brown has brought federal and state law claims arising from her unconstitutional arrest by New York City Police Department ("NYPD") officers Defendants Justin Naimoli and Theodore Plevritis.   The officers arrested Ms. Brown without probable cause that she had committed any offense and used excessive force, including force that violated the NYPD's own policy against the proper use of pepper spray.   The officers arrested Ms. Brown just blocks from Zuccotti Park, where she had spent several hours observing the NYPD's eviction of Occupy Wall Street ("OWS") protestors from the Park.   Despite specific instructions that evening to stay clear of the police action clearing Zuccotti Park, the officers' words and conduct reveal that they intended to arrest people like Ms. Brown who supported the OWS protests.

In a transparent  effort to justify the unlawful arrest, Officer Naimoli filed a criminal complaint which falsely stated that he had observed Ms. Brown banging on the door of a Starbucks.   In fact, as Officer Naimoli admitted in his deposition, he did not see Ms. Brown

---

[1] Without conceding that her claims under the Fourteenth Amendment lack merit, Plaintiff has decided not to press forward with those claims.

doing any such thing.  Indeed, both officers' testimony is clear that they did not see Ms. Brown do anything illegal before they arrested her.  During his deposition, Officer Naimoli contrived to explain his false statement in the criminal complaint by claiming that he told the prosecutor who drafted it that he was "informed" by a witness that Ms. Brown was banging on the Starbucks door, and the prosecutor misheard him.  But the prosecutor who drafted the complaint testified that he would have paid particular attention to the personal observations of the arresting officer because it is unlawful to make an arrest for a violation like disorderly conduct unless the officer personally observed the conduct.  The prosecutor testified that he would have handled the case differently if Officer Naimoli had told him that he had been informed of Ms. Brown's alleged conduct, as opposed to having personally observed it.

Thus, not only did Officer Naimoli lie to justify Ms. Brown's unlawful arrest, but he has perjured himself again during this litigation to defend his earlier lie.  Unsurprisingly, Defendants' summary judgment papers omit any reference to Officer Naimoli's testimony.  Defendants likewise ignore incredible testimony by Officer Plevritis meant to cover his intent to arrest people affiliated with OWS the evening of Ms. Brown's arrest.  Since Defendants' motion is premised on accepting the officers' version of events as true, and their testimony lacks veracity, Defendants' motion must be denied.

Defendants' motion also overlooks a significant dispute of material fact.  Defendants assert throughout their motion that before the officers approached Ms. Brown, they spoke with the Starbucks manager and he allegedly told them that Ms. Brown and others were banging on the door of the Starbucks.  Ms. Brown's testimony—as well as the testimony of the officers and the Starbucks manager coupled with the video evidence—proves that the officers spoke with the Starbucks manager only after they had arrested Ms. Brown.  Indeed, Defendants' own Rule 56.1

Statement acknowledges this factual dispute.  *Compare* Defs.' 56.1 ¶¶ 37-40 (stating that Officer

Plevritis spoke with the Starbucks manager before approaching Ms. Brown), *with id.* ¶¶ 43-44

(Ms. Brown testified that she "never saw the officers go to the door of the Starbucks or speak to

a Starbucks employee").[2]  Defendants' qualified immunity defense likewise rests on the same

disputed facts.  Thus, Defendants have failed to show the absence of a genuine issue of material

fact, which defeats their motion for summary judgment and qualified immunity defense.

## BACKGROUND

In the early morning hours of November 15, 2011, Ms. Brown was standing outside of a

Starbucks in lower Manhattan waiting for the store to open so that she could use the bathroom.

Defs.' 56.1 ¶¶ 8-9, 16.  She had spent the past several hours observing and peacefully protesting

the NYPD's eviction of OWS protestors from Zuccotti Park.  *Id.* ¶ 7; Pl.'s 56.1 ¶ 114.  Many

OWS supporters were in lower Manhattan as a result of the NYPD's operation in the Park that

night.  Pl.'s 56.1 ¶¶ 114, 136.  Around 5:00 a.m., Ms. Brown and a friend, Johnny Sagan, left the

vicinity of Zuccotti Park to find a bathroom and saw the lights on at a nearby Starbucks.

Defs.' 56.1 ¶¶ 8-9.  Ms. Brown knocked on the door and a Starbucks employee told her the store

would be opening shortly, so she, Mr. Sagan, and another person who had arrived and also

needed to use the bathroom, waited outside on the sidewalk.  *Id.* ¶¶ 11-17; Pl.'s 56.1 ¶¶ 11-17.

That evening, NYPD Officers Naimoli and Plevritis were working their usual 11:15 p.m.

to 7:50 a.m. shift in the First Precinct, where Zuccotti Park is located.  Pl.'s 56.1 ¶¶ 115-116.

Sergeant Joseph Taylor, a squad sergeant in the First Precinct, spoke at roll call at the beginning

of the shift; Officers Naimloi and Plevritis were present for that debriefing.  *Id.* ¶¶ 117-119.

---

[2] As used herein, "Defs.' 56.1" refers to Defendants' Local Rule 56.1 Statement of Undisputed Fact; "Defs.' Mot." refers to Defendants' Memo. of Law in Support of their Motion for Summary Judgment; "Pl.'s 56.1" refers to Plaintiff's Response to Defendants' Local Rule 56.1 Statement and Statement of Additional Material Facts; and "Moskovitz Decl." refers to the April 18, 2014 Declaration of Joshua S. Moskovitz in Opposition to Defendants' Motion for Summary Judgment, to which the exhibits referenced herein are attached.

Taylor told the officers about the NYPD's planned operation to clear out Zuccotti Park that night and instructed them to avoid the Park because the NYPD's OWS detail was handling the operation.  *Id.* ¶¶ 120-121.  Disregarding Sergeant Taylor's instructions, Officers Naimoli and Plevritis decided to go to Zuccotti Park early in their shift and to join in policing the OWS protestors being evicted.  *Id.* ¶¶ 126-127.  While there, Officer Plevritis decided to arrest a person just outside the park.  *Id.* ¶ 129.

After processing that arrest, shortly after 5:00 a.m. the officers received a radio dispatch of "six people banging on the doors refusing to leave at Starbucks coffee" located at 233 Broadway.  Defs.' 56.1 ¶¶ 28-29; Pl.'s 56.1 ¶¶ 28, 90.  The radio transmission did not describe any individual, did not name Ms. Brown, and did not indicate in any way that Ms. Brown was banging on the Starbucks door.  Pl.'s 56.1 ¶¶ 91-92.  When the officers arrived at the Starbucks several minutes later there were only three people standing outside of the store.  *Id.* ¶ 35.  The three people were doing nothing but standing there.  *Id.*  The officers did not see anyone banging on the door of the Starbucks, did not see Ms. Brown banging on the door or the glass of Starbucks, and did not see Ms. Brown yell at the Starbucks employee.  *Id.* ¶¶ 93-95.

Observing no criminal activity, the officers sat in their patrol car and radioed to the dispatcher to call back the person who had placed the 911 call.  *Id.* ¶¶ 31, 34.  Meanwhile, Ms. Brown approached the officers' car and asked them if they could direct her to a bathroom nearby.  *Id.* ¶¶ 37, 43-45; Defs.' 56.1 ¶¶ 43-45. The officers responded sarcastically, "what do we look like, the potty police?"  Pls.' 56.1 ¶ 45.  Ms. Brown replied "no, of course not, but I figured that you would know the area better than I did and wondered if you could help."  *Id.*  The officers told Ms. Brown to "go piss in the park."  *Id.*  Ms. Brown asked "isn't that illegal, won't you arrest me for doing that?" to which the officers responded "yes."  *Id.*  Ms. Brown finally

4

asked "so you are just not going to help me, you don't have anything you can offer me, any advice you can offer me?" *Id.* ¶ 46. The officers said that she should go home. *Id.* Ms. Brown explained that she lived over an hour away and she would wait for the Starbucks to open. *Id.*

At that point, Ms. Brown began to walk away from the officers' car. *Id.* The officers left their vehicle and approached Ms. Brown. Defs.' 56.1 ¶ 49. As they approached her, and although they had no lawful justification to do so, they asked her for her identification. Defs.' 56.1 ¶ 50; Pl.'s 56.1 ¶ 50. Ms. Brown responded with confusion and fear and asked several times "on what grounds?" Pl.'s 56.1 ¶ 50-51. The officers never answered her question, and so Ms. Brown, as was her right,[3] declined to provide her ID. Pl.'s 56.1 ¶¶ 50-52. The officers then grabbed Ms. Brown and told her "we were going to give you a citation, but now you are going to jail." *Id.* ¶¶ 53-54; Defs.' 56.1 ¶¶ 53-54. Ms. Brown repeatedly asked why she was being arrested, but the officers never gave her a reason. Pl.'s 56.1 ¶ 55; Defs.' 56.1 ¶ 55.

Having been given no explanation as to why she was being placed under arrest, and because she was carrying both a purse and a cell phone in her hands, Ms. Brown did not voluntarily place her hands behind her back. Pl.'s 56.1 ¶¶ 55, 62; Defs.' 56.1 ¶ 55. At that point, and without any lawful justification whatsoever, the officers grabbed hold of each of her arms and Officer Naimoli placed one of Ms. Brown's hands in handcuffs, and then used a leg sweep to violently throw Ms. Brown to the ground. Pl.'s 56.1 ¶ 60, 147. It was unnecessary and objectively unreasonable for the officers to throw Ms. Brown to the ground to restrain her. *Id.* ¶¶

---

[3] Since the officers had no reasonable suspicion, let alone probable cause, to stop and question Ms. Brown, she was within her rights to refuse to provide the officers with identification. *See People v. Howard*, 50 N.Y.2d 583, 590-92 (1980) ("[W]hile the police had the right to make the inquiry, defendant had a constitutional right not to respond. . . . Nor can the failure to stop or co-operate by identifying oneself or answering questions be the predicate for an arrest absent other circumstances constituting probable cause.") (citing *People v. De Bour*, 40 N.Y.2d 210, 223 (1976)); *People v. Lupinacci*, 191 A.D.2d 589, 590 (2d Dep't 1993) ("[T]he police were not authorized to attempt to detain the defendant because, under the circumstances, they did not possess a reasonable suspicion that the defendant was involved in criminal activity. Thus, the defendant was free to walk away, and any attempt to detain him was unauthorized. (internal citations omitted)).

60, 63, 147-148.  Being thrown to the ground only heightened Ms. Brown's state of fear and shock at how she was being treated.  The officers proceeded to press her body and face into the pavement, knee her in the back, and—while they restrained her—twice sprayed her in the face with pepper spray.  *Id.* ¶¶ 60, 80, 147-148.  Officer Naimoli does not deny that "in arresting [Ms. Brown], the officers kicked her legs out from under her, causing her to fall to the ground on her knees, pressed her face into the ground, and sprayed her in the eyes at least twice with pepper spray while they restrained her."  *Id.* ¶ 148.  Both times the officers sprayed Ms. Brown, they were well within three feet of her face.  *Id.* ¶¶ 152-153.  This contravenes NYPD written policy and training, which provides that pepper spray should not be discharged from closer than three feet in order to avoid a dangerous "hydraulic needle effect."  *Id.* ¶¶ 155-156.

After Ms. Brown was handcuffed, and while she was kneeling on the ground, she pleaded with the officers to pull her skirt down, which had come up during the fracas, so that her lower body would not be exposed when they lifted her up.  *Id.* ¶ 149.  By then, people had gathered and several were taking pictures and videos of the officers' mistreatment of Ms. Brown.  *Id.* ¶¶ 143-144.  The officers said "no," and yanked Ms. Brown to her feet exposing her lower body to the gathered crowd and cameras.  *Id.* ¶ 149.  The officers then pushed Ms. Brown into their patrol car face first while her hands were cuffed behind her.  *Id.* ¶ 150.  After several minutes, the officers returned and ordered her to step out; she told them though that she could not see, to which Officer Plevritis responded "good."  *Id.* ¶ 152.  They then drove Ms. Brown to the First Precinct where they processed her arrest.  Defs.' 56.1 ¶ 84.

The only conduct that the officers have alleged Ms. Brown committed when they arrested her was that she used profane language when speaking to them in their car and refused to leave the area at that point.  Pl.'s 56.1 ¶ 88.  Officer Plevritis' memo book entry for the arrest, similar

6

to what Officer Naimoli entered in the arrest report, described Ms. Brown's conduct before her arrest as "refuses to leave location and refuses to give ID." *Id.* ¶¶ 99, 102-103.  The arrest report likewise claimed that Ms. Brown "was asked to leave . . . after causing a disturbance in front of a store," she "refuse[d] this order," and "refuse[d] to give ID and responded with profanity." *Id.* ¶ 88.[4]  The arrest report indicated one disorderly conduct provision as the basis for Ms. Brown's arrest: Penal Law § 240.20(6), "refusing to move on." *Id.*

Later in the evening, Officer Naimoli spoke with New York County Assistant District Attorney ("ADA") James Lynch, who was working in the Early Case Assessment Bureau ("ECAB") screening cases. *Id.* ¶ 107.  ADA Lynch prepared a criminal complaint based on what Officer Naimoli told him, which contained a different narrative than what Officer Plevritis wrote in his memo book and what Officer Naimoli entered in the arrest report. *Id.* ¶¶ 88, 107.  The criminal complaint did not charge Ms. Brown with violating Penal Law § 240.20(6) and made no mention of Ms. Brown refusing to leave or refusing to provide her identification.  Instead, it charged her with violating subsections (1) and (3) of § 240.20 for allegedly having "engaged in fighting and in violent, tumultuous and threatening behavior" and "used abusive and obscene language and made an obscene gesture in a public place" "with intent to cause to cause public inconvenience, annoyance and alarm and recklessly causing a risk thereof." *Id.* ¶ 88.  The Complaint, signed under oath by Officer Naimoli, alleged that he personally observed Ms. Brown "banging on the door of Starbucks and screaming" that she needed to use the

---

[4] Officer Naimoli, the arresting officer in this incident, prepared a "scratch" complaint report, which the NYPD utilizes for handwritten notes about a complaint that leads to an arrest.  Moskovitz Decl. ¶ 2.  Although scratch reports are kept in the ordinary course of business of the NYPD, and scratch complaint reports for First Precinct arrests are customarily kept in the files at the precinct, defendants are unable to locate Officer Naimoli's scratch report. *Id.* ¶¶ 3-4.  "The spoliation of evidence germane 'to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.'" *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).  "[A]n inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Id.* (quoting *Kronisch*, 150 F.3d at 128).

bathroom, and that her conduct "caused a crowd to gather and people to express alarm," none of which if true. *Id.* ¶¶ 88, 103-104.   Officer Naimoli has admitted that he did not personally observe Ms. Brown banging on the door of Starbucks and that this statement in the complaint was not true. *Id.* ¶ 104.   He has also acknowledged that he did not see her yelling at a Starbucks employee. *Id.* ¶ 95.   Not surprisingly, the charges were ultimately dismissed. *Id.* ¶ 89.

Plaintiff filed her complaint on February 13, 2013, and her amended complaint on July 9, 2013 (ECF No. 7).   Defendants filed their answer on October 28, 2013 (ECF No. 12).   On February 13, 2014 Defendants served this motion for summary judgment (ECF No. 34). The Court subsequently permitted Plaintiff to take the deposition of ADA Lynch (ECF No. 43).

## LEGAL STANDARD

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'"   *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   "'A genuine issue exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'"   *Rivera v. Rochester Genesee Reg. Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).   In determining whether a genuine dispute exists, the Court must "'constru[e] all the evidence in the light most favorable to the non-movant and draw[] all reasonable inferences in [her] favor.'"   *Id.* (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009)).   As the moving party, Defendants bear the burden to show the absence of a genuine dispute of any material fact.   *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## ARGUMENT

### I.      The Officers Have Perjured Themselves and Are Not Credible

"[I]n ruling on a motion for summary judgment, the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996).  While this summary judgment principle is routinely stated, it has particular application in this case where the officers have proven themselves to lack veracity by making several false statements in the underlying criminal court documents, and committing perjury and giving incredible testimony in this litigation.  A jury educated to the officers' mendacity is likely to discredit their testimony, and because the Defendants' motion rests on accepting the officers' version of events as true, the Court should deny summary judgment.

Most troubling, Officer Naimoli knowingly and falsely alleged in the criminal complaint against Ms. Brown that he had observed her banging on the door of the Starbucks.  Pl.'s 56.1 ¶¶ 88, 103-104  He admitted in his deposition that this allegation was not true.  *Id.*  His motive for making this false statement is clear: he had no other basis to justify his arrest of Ms. Brown.  When the officers arrested Ms. Brown, they knew only that she was standing in front of a Starbucks at 5:00 a.m. in lower Manhattan, had asked them to direct her to a bathroom, had walked away from them when they were gratuitously rude to her, and had declined to provide her ID when they asked for it, even though under this set of facts she had no obligation to provide them with anything.  They claim that the Starbucks manager told them that Ms. Brown was banging on the door of the store, but the evidence is clear that they received this information only *after* they had arrested Ms. Brown.  *Id.* ¶¶ 37-40.  Aside from when they learned this information, the officers candidly admitted that they could not make an arrest for an offense like

disorderly conduct, which is a violation under New York law, *see* N.Y. Penal Law § 240.20, unless they have personally observed the conduct constituting the offense, *see* N.Y. Crim. Proc. Law § 140.10; Pl.'s 56.1 ¶ 105.  Thus, when Officer Naimoli spoke with ADA Lynch, who drafted the complaint, he told him that he had personally observed Ms. Brown banging on the Starbucks door in order to justify the arrest.  Pl.'s 56.1 ¶¶ 108-112.

Compounding Officer Naimoli's knowing false allegation in the criminal complaint, which vitiates the legality of the arrest, Officer Naimoli perjured himself in this litigation by falsely claiming that he told ADA Lynch that he was "informed" that Ms. Brown was banging on the Starbucks door.  *Id.* ¶ 106.  Although ADA Lynch did not specifically recall drafting the complaint in this case—he estimates that he has drafted 1300 complaints in his career—he was very clear that he would have paid particular attention to what Officer Naimoli, as the arresting officer, told him he personally observed versus what he was informed, because of the difference that it makes for a violation arrest.  *Id.* ¶¶ 108-109.  ADA Lynch testified that if Officer Naimoli had told him that he was informed that Plaintiff was banging on the door of Starbucks, he would have drafted the complaint differently and would have put the names of civilian witnesses on the DA Data Sheet; but the DA Data Sheet mentions no civilian witnesses.  *Id.*  Thus, despite ADA Lynch's lack of specific recollection of what Officer Naimoli told him, it is clear that Naimoli did not tell him that he was "informed" that Ms. Brown was banging on the Starbucks door.

What is clear is that Naimoli knowingly and falsely stated to ADA Lynch that he observed Ms. Brown knocking on the door of the Starbucks and that he has compounded his untruthfulness by falsely claiming that ADA Lynch must have misheard him.  ADA Lynch testified that when he prepares a criminal complaint for an officer to sign, he tells them to "make sure that everything in it attributed to you is true" and "if it is, sign it and send it back," but if

10

there are any corrections that they can call him back to make those changes.  Pl.'s 56.1 ¶ 111.

He also testified that officers have contacted him to say that there is something that needs to be

changed in the complaint.  *Id.*  Thus, the defendants ignore the fact that under established

procedures Officer Naimoli had an opportunity to review the complaint as drafted by ADA

Lynch, at which time he could have pointed out the stark error in the complaint, but he did not.

Officer Plevritis also gave incredible testimony in this litigation.  First, he testified that he

was unaware that the NYPD was carrying out a large operation to clear Zuccotti Park the night

of November 14 to 15, 2011, and that he first became aware of this fact when he and Officer

Naimoli drove by the Park that night.  *Id.* ¶ 123.  When confronted with the doubtfulness of this

testimony, he claimed this was the only time in his eight year career that he was unaware of a

large police operation like that at Zuccotti Park taking place in his precinct during one of his

shifts.  *Id.* ¶ 124.  Officer Naimoli testified that he knew about the operation, and Sergeant

Taylor testified that he told the squad at roll call about the operation and instructed them to avoid

the Park that night.  *Id.* ¶¶ 118-122.  Plevritis and Naimoli were at roll call.  *Id.* ¶ 119.  Spinning

such a strange and unbelievable story reflects on the lack of Officer Plevritis' veracity and

suggests that he was shielding the truth about some more grave fact, such as his intent to arrest

people during that shift who were affiliated with or supporting OWS.  *See infra* Point III.  He

also testified that he was approximately three feet away when he pepper sprayed Ms. Brown the

second time, Pl.'s 56.1 ¶ 155, but the video leaves no doubt that Officer Plevritis was standing

immediately in front of Ms. Brown, with his hand directly in her face, when he sprayed her.

These are serious instances of lying by sworn police officers, and the Court should not

accept their testimony for the purposes of summary judgment.  "Lying is wrong, and if the police

lie while acting in their official capacity, they also violate the public trust.  Courts must ensure

that such serious accusations receive appropriate scrutiny lest our Court appears to endorse such official misconduct, which would weaken the public's respect for the administration of justice." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 125 (2d Cir. 1997). In order for summary judgment to be appropriate here, a jury would be required to credit the officers' testimony, but once their perjury and incredible testimony is revealed, the jury will have every reason to disbelieve these officers.  Thus, the Court should deny summary judgment.

## II.    Plaintiff's Arrest Was Unconstitutional

### A.    The officers arrested Plaintiff without probable cause in violation of the Fourth Amendment where they had no information that she had committed any offense when they arrested her.

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law."  *Weyant*, 101 F.3d at 852 (citations omitted).  "Under New York law, a plaintiff claiming false arrest must show, *inter alia*, that the defendant intentionally confined him without his consent and without justification."  *Id.* Defendants do not contest that the defendant officers intentionally confined Plaintiff; instead, they argue that they had probable cause to do so.

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983."  *Id.* (citations and internal quotation marks omitted).  "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Id.*  In evaluating the existence of probable cause, courts only "consider the facts available to the officers at the time of the arrest."  *Ricciuti*, 124 F.3d at 128 (2d Cir. 1997).  When the question of whether an arresting

12

officer had probable cause is "predominantly factual in nature"—as it is in the case at bar—the question "[i]s properly presented to the jury." *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994); *see also Weyant*, 101 F.3d at 852 (summary judgment improper where a factual "dispute [exists] as to the pertinent events and the knowledge of the officers").

Here, the Defendants overlook a factual dispute that topples their motion: whether the officers spoke with Torres, the Starbucks manager, before they arrested Ms. Brown.  The central pillar of Defendants' motion is that the officers purportedly acquired probable cause from speaking with Torres who allegedly told them that Ms. Brown was banging on the door.  *See* Defs.' Mot. 3, 7-8, 9, 11, 12, 13.  Aside from the fact that knocking on the door of a Starbucks to inquire about using the bathroom is not disorderly conduct, *see People v. Baker*, 20 N.Y.3d 354, 359-60 (2013) ("a person may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem"), it is disputed that the officers knew any of this before they arrested Ms. Brown.  Plaintiff's Rule 56.1 Statement explains that Officer Naimoli and Torres testified that the officers spoke only once with Torres, and the video shows the officers speaking with him *after* Ms. Brown was arrested.  Pl.'s 56.1 ¶¶ 37-40, 97-98.  Thus, Defendants are not entitled to summary judgment because their probable cause argument is based entirely on a disputed fact.

Putting aside what the Defendants now claim the Starbucks manager told the officers, the only information the officers had when they responded to the Starbucks was the radio dispatch, which said there were "six people banging on the doors refusing to leave." *Id.* ¶ 90.  The dispatch did not describe any individual, did not name Ms. Brown, and did not indicate that Ms. Brown was banging on the Starbucks door. *Id.* ¶¶ 91-92.  When the officers arrived, they did not see anyone banging on the door, and did not see Ms. Brown doing anything illegal. *Id.*

¶¶ 93-95.  Based on this information—the only information known to the officers before they arrested Ms. Brown, and thus, the only information that matters, *see Ricciuti*, 124 F.3d at 125— there was no lawful basis to arrest Ms. Brown.  That should have been the end of this story.

Defendants' contention that Plaintiff could have been arrested for harassment in the second degree under Penal Law § 240.26(3) is based on a mistaken view of what happened and what the officers knew.  Defendants circumvent the officers' lack of information by relying on what others later said happened and adding facts that don't exist.  The Defendants claim that the Starbucks manager was "fearful for safety and property" and that "[Ms. Brown] admi[tted] that it was her alone banging on the doors."  Defs.' Mot. 8.  Yet, the officers did not know about this putative concern—which Plaintiff disputes, *see* Pl.'s 56.1 ¶ 26—when they arrested Ms. Brown.[5] And the assertion that she admitted she was banging on the doors is simply untrue; Defendants cite nothing to support this claim and her testimony refutes the notion.  *See id.* ¶ 19.

Similarly misplaced is Defendants' reliance on disorderly conduct under Penal Law § 240.20(1), (2), or (3).  Defs.' Mot. 9.  Again, there is a genuine dispute whether the officers spoke with Torres before approaching Ms. Brown.  Based on what actually occurred, there is simply no reasonable basis for any officer to have thought that there was probable cause to arrest Ms. Brown, or anyone for that matter, for disorderly conduct.  Ms. Brown's testimony about what occurred before the officers arrested her demonstrates the absence of a necessary element of each subsection of § 240.20 relied upon by Defendants.[6] Moreover, it is obvious that Ms.

---

[5] Accordingly, Defendants' reliance on *Jaegly v. Couch*, 439 F.3d 149 (2d Cir. 2006), is misplaced because in that case, before arresting Jaegly, the arresting officer "interview[ed]" the complaining witness, who told them that he "feared for his safety" and "felt threatened" by Jaegly's actions.  *Id.* at 151.

[6] Subsection (1) applies when a person "engages in fighting or in violent, tumultuous or threatening behavior"; subsection (2) applies when a person "makes unreasonable noise"; and subsection (3) applies where a person "uses abusive or obscene language, or makes an obscene gesture."  Plaintiff clearly did none of these things when she approached the officers car and asked them if they knew where she could find a bathroom.

14

Brown's private interaction with the officers about where she might find a bathroom fails to evince any threat to public safety.

> [C]ritical to a charge of disorderly conduct is a finding that defendant's disruptive statements and behavior were of a public rather than an individual dimension. This requirement stems from the mens rea component, which requires proof of an intent to threaten public safety, peace or order (or the reckless creation of such a risk). Thus, "a person may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem."

*Baker*, 20 N.Y.3d at 359-60 (quoting *People v. Weaver*, 16 N.Y.3d 123, 128 (2011)).

Defendants then mistakenly point to Penal Law § 240.20(6) and argue that Ms. Brown "declined to leave the area after being asked to go home and ordered to disperse." Defs.' Mot. 9. First, the officers did not ask Ms. Brown to go home or to disperse; they told her that she should go home in response to her question about whether they had any advice on where she could use the bathroom. Pl.'s 56.1 ¶ 46. Second, an order to disperse under Pen. Law § 240.20(6) must be "lawful," which it was not here because Ms. Brown had done nothing wrong and the officers had seen her do nothing that justified ordering her to disperse, and there was no crowd on the sidewalk that could be said to have been obstructing pedestrian traffic. *See People v. Johnson*, No. 43, 2014 N.Y. Slip. Op. 02217 (N.Y. Apr. 1, 2014) ("[E]vidence of actual or threatened public harm . . . is a necessary element of a valid disorderly conduct charge" and "[i]t is not disorderly conduct . . . for a small group of people, even people [reputed to be gang members], to stand peaceably on a street corner") (citing *Weaver*, 16 N.Y.3d 123).

Finally, Defendants contend that Ms. Brown committed obstruction of governmental administration ("OGA") under Penal Law § 195.05 because "[o]fficers told plaintiff to disperse or go home" and she did not. Defs.' Mot. 10. Again, the evidence is that the officers did not tell Ms. Brown to disperse nor order her to leave. Even if they had, *arguendo*, ordered Ms. Brown to

disperse, they had no lawful basis to do so, and a necessary element of § 195.05 is obstruction of "an official function," which means "authorized conduct." *See Lupinacci*, 191 A.D.2d at 590 ("[T]he police were not authorized to attempt to detain the defendant because, under the circumstances, they did not possess a reasonable suspicion that the defendant was involved in criminal activity. Thus, the defendant was free to walk away, and any attempt to detain him was unauthorized." (internal citations omitted)).[7]

Defendants also contend that the officers had the authority to demand Ms. Brown's identification "[a]s probable cause existed to arrest plaintiff on various other charges at that point," and "even if the officers merely sought to investigate the 911 call, they were still entitled to ask for plaintiff's identification" and refusal would constitute a violation of § 195.05. Defs.' Mot. 10. This is incorrect. There was no probable cause to arrest Ms. Brown for any offense simply because she approached the officers and asked for directions to a bathroom, nor was there reasonable suspicion that Ms. Brown had committed, was committing, or was about to commit a crime. Therefore, Ms. Brown had an absolute right to refuse to provide identification. *See People v. Offen*, 96 Misc. 2d 147, 150 (N.Y. Crim. Ct. 1978) ("ignoring an officer's request for identification is not a crime, nor does that act supply any such element"), *cited approvingly in Matter of Davan L.*, 91 N.Y.2d 88, 91 (1997); *see also People v. May*, 81 N.Y.2d 725 (1992) ("The police may not forcibly detain civilians in order to question them . . . without a reasonable suspicion of criminal activity and once defendant indicated . . . that he did not wish to speak with the officers, they should not have forced him to stop without legal grounds to do so."); *Howard*,

---

[7] Defendants misplace reliance on *Berger v. Schmitt*, 91 F. App'x 189 (2d Cir. 2004), and *C.G. v. City of New York*, No. 12-cv-1606, 2013 U.S. Dist. LEXIS 153020 (E.D.N.Y. Oct. 24, 2013). In *Berger*, the plaintiff returned to the scene of an altercation and the "officers could believe that [he] was attempting to interfere with [their] efforts to contain what had only recently been a volatile situation," 91 F. App'x at 191; and in *C.G.*, which relies on *Berger*, the Court denied summary judgment for the defendants because it found there was a dispute of fact about whether the plaintiff had failed to comply with a lawful order, 2013 U.S. Dist. LEXIS 153020, at *21.

50 N.Y.2d at 590-92 (1980) ("[W]hile the police had the right to make the inquiry, defendant had a constitutional right not to respond. . . . Nor can the failure to stop or co-operate by identifying oneself or answering questions be the predicate for an arrest absent other circumstances constituting probable cause.").  Moreover, § 195.05 requires "physical force or interference," which is not met by "mere words alone."  *People v. Case*, 42 N.Y.2d 98 (1977) ("Under the express provisions of the statute, the interference would have to be, in part at least, physical in nature."); *see also Matter of Davan L.*, 91 N.Y.2d at 91 ("[P]urely verbal interference may not satisfy the 'physical' component under Penal Law § 195.05").

### B.    The force used was excessive in violation of the Fourth Amendment.

"The Fourth Amendment prohibits . . . excessive force by a police officer in the course of effecting an arrest."  *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

> [T]he inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake.  In conducting that balancing, we are guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

*Id.* (citations omitted).

Ms. Brown's alleged offense was not even a "crime" under New York law, but merely a violation, *see* N.Y. Pen. Law § 10.00(3), (6); she posed no threat to the safety of the officers or others; and she was not actively resisting or attempting to evade arrest.  Accordingly, the brutal force used to arrest her was excessive.  Officer Naimoli does not deny that in arresting Plaintiff, the officers kicked her legs out from under her, causing her to fall to the ground on her knees, pressed her face into the ground, sprayed her in the eyes at least twice with pepper spray while they restrained her.  Pl.'s 56.1 ¶ 148.  The video evidence confirms that before kicking Ms.

17

Brown to the ground, Officer Naimoli had placed one of her wrists in handcuffs.  Ex. 18 (00:08-00:10).  With Ms. Brown on the ground, Plevritis kicked her, *see id.* (00:51-54) (saying "don't kick me"); they pushed her face into the pavement, *id.* (01:20-01:22); Plevritis sprayed pepper spray directly at her face from a close distance while they were holding her arms, *id.* (01:40-01:50); Ms. Brown was kneeling in place on the ground and Officer Plevritis walked in front of her, said, "you're gonna get it again," pushed her face up towards him, and sprayed pepper spray directly into her face again, *id.* (02:04-02:13); and the officers pushed Ms. Brown into the police car face first while her hands were cuffed behind her, *id.* (03:52-04:01).

The force used was also excessive insofar as it was unnecessary.  Ms. Brown was 5'6" tall and weighed 120 pounds; Officers Plevritis and Naimoli were 5'10" and 215 pounds and 5'7" and 150 pounds, respectively.  Pl.'s 56.1 ¶¶ 133-135.  The officers knew techniques that they could have used, if they had chosen, to restrain Ms. Brown without throwing her to the ground and pepper spraying her twice.  *Id.* ¶¶ 145-146.  Indeed, earlier that evening, during the same shift, Officer Plevritis was able to overcome the resistance of a man 5'9" and 160 or 170 pounds and place him under arrest without throwing him to the ground or pepper spraying him. *Id.* ¶¶ 130-132.  The officers' malice is reflected in the way they refused to pull Ms. Brown's skirt down, exposing her lower body to the gathered crowd, Pl.'s 56.1 ¶ 149, and Officer Plevritis saying that it was "good" when Ms. Brown said she couldn't exit the patrol car because she couldn't see.  *Id.* ¶ 151.  The fact that the officers acted so violently is in line with Sergeant Taylor's assessment of them: he assessed them both as "aggressive when it comes to making arrests," an assessment they both concurred in and believed was accurate.  *Id.* ¶ 157-158.

Deploying pepper spray from such a close distance was, in and of itself, excessive.  *See Tracy*, 623 F.3d at 98 ("[A] reasonable juror could find that the use of pepper spray deployed

mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force.").  It also violated the express policy of the NYPD.  *See* Pl.'s 56.1 ¶¶ 155-156 (instructing officers not to deploy pepper spray from closer than three feet away because of the serious danger of "hydraulic needle effect").

Defendants mistakenly contend that Ms. Brown was resisting and that her resistance justified their force.  There is a clear dispute of fact about whether Ms. Brown was in fact resisting.  *See* Pl.'s 56.1 ¶¶ 55-80.  Despite the officers' statements on the video that Ms. Brown was resisting, these out of court statements provide no evidence that Plaintiff was resisting, are inadmissible hearsay to prove that fact, and were clearly said to justify their otherwise unjustified conduct.  Moreover, "there can be no cavil with the proposition that a citizen may use reasonable force in self-defense where the force exerted by the police in effecting an arrest is excessive." *People v. Stevenson*, 31 N.Y.2d 108, 112 (1972).  Here, the officers violently kicked Ms. Brown to the ground without cause and proceeded to kick her and drive her face into the pavement.  A reasonable jury can find that the officers' force was excessive and that at most, Ms. Brown used reasonable force to protect her face and body from this unjustified assault.

## III.    First Amendment Claim

"To prevail on a First Amendment retaliation claim, plaintiff must prove '(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right.'"  *Anderson v. City of N.Y.*, 817 F. Supp. 2d 77, 96 (E.D.N.Y. 2011) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)).

First, a reasonable jury can find that the officers arrested Ms. Brown because she engaged in protected speech by criticizing the officers' actions.  *See* Pl.'s 56.1 ¶¶ 45-46, 50-52, 88, 112. The officers claim that they arrested Ms. Brown because she used profanity, refused to leave, and

refused to give her identification.  *Id.* ¶¶ 88, 112.  Even assuming, *arguendo*, that the officers ordered Ms. Brown to leave, they had no lawful authority for that order nor to demand that Ms. Brown produce her ID.  *Id.* ¶¶ 50-52; *supra* Point II.A.  Ms. Brown's response reflected appropriate dismay at the officers' inappropriate remark, "what do we look like, the potty police?"  Ms. Brown's consternation when they demanded her ID without cause, and her baffled, frightened reaction to their harassing behavior was protected, even if it did include profanity.  It is "well established that 'the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.'" *Webster v. City of N.Y.*, 333 F. Supp. 2d 184, 201 (S.D.N.Y. 2004) (quoting *City of Houston v. Hill*, 482 U.S. 451, 461 (1987)); *see also Posr v. Court Officer Shield # 207*, 180 F.3d 409, 415 (2d Cir. 1999) ("'[P]rovocative' speech directed at police officers is 'protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.'" (quoting *City of Houston*, 482 U.S. 451)).  Because the officers' testimony reveals that they arrested her in retaliation for exercising her First Amendment rights, Defendants are not entitled to summary judgment.

Second, the evidence shows that the officers arrested and assaulted Ms. Brown in retaliation for her support for and affiliation with the OWS movement.  Defendants' position appears to be that, because Ms. Brown "was not engaged in expressive activities at the time of her arrest," there can be no retaliation claim, Defs.' Mot. 20-21, but this is incorrect.  The courts have never imposed such a requirement, and instead have held that the pivotal issue is whether the retaliatory conduct was motivated by the victim's First Amendment activities.  Thus, close temporal proximity between the First Amendment activity and the adverse action is strong circumstantial evidence of ill motive.  *See, e.g., Webster*, 333 F. Supp. 2d 184.

Here, there is a close nexus between Ms. Brown's expressive activity and Defendants' retaliatory conduct: She was arrested with excessive force approximately thirteen minutes after leaving Zuccotti Park at a location only blocks from where she had been observing and protesting the NYPD's eviction of OWS demonstrators.   Defs.' 56.1 ¶¶ 8-9, 69-70, 82.   A plaintiff may show "improper motive [through]…'expressions by the officials regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken.'"   *Anderson*, 817 F. Supp. 2d at 96 (quoting *Blue v. Koren*, 72 F.3d 1075, 1082-1083 (2d Cir. 1995)).

Prior to arresting Ms. Brown, the officers disobeyed Sergeant Taylor's instructions, went to Zuccotti Park where the NYPD was evicting protestors from the Park, and without being ordered to, arrested a person affiliated with OWS.   Pl.'s 56.1 ¶¶ 118-122, 126-129.   A reasonable juror could infer that the officers intended to arrest OWS protesters that morning, which is precisely what they did.   *Id.*   Moreover, their insolence toward Ms. Brown in response to her innocent request for direction to a public bathroom reveals that the officers harbored animosity toward the OWS movement.   *Id.* ¶ 45.   Their decision to arrest Ms. Brown because she asked them where she could find a bathroom, their use of brutal physical force, and their employment of pepper spray—which Officer Plevritis has used only twice in his nearly eight-year career as an NYPD officer—all reflects the officers' derision of people, like Ms. Brown, who are affiliated with the OWS movement.   Pl.'s 56.1 ¶¶ 57, 60-75, 135-143.

It would have been clear to the officers that Ms. Brown was affiliated with OWS. They encountered her blocks from Zuccotti Park soon after OWS protestors were evicted.   Officer Naimoli testified that he could have inferred that the many people on the streets were related to OWS.   *Id.* ¶¶ 81, 136.   When Ms. Brown asked the officers for the location of a bathroom, one of

them told her "to go piss in the park," which the jury can infer meant Zuccotti Park.  *Id.* ¶ 45. Officer Naimoli told Ms. Brown that the booking process was taking longer than usual because "[t]here aren't any cops available because they're all out dealing with your friends," which she understood to mean other OWS protesters.  *Id.* ¶ 161.  Even Torres readily identified the people waiting outside of the Starbucks as affiliated with OWS. *Id.* ¶ 81.[8]

Finally, the officers' actions chilled Ms. Brown's First Amendment activity.  As a direct consequence of the fear and distrust caused by her false arrest, Ms. Brown reduced her involvement with OWS, particularly the protest and demonstration aspects of the movement. *Id.* ¶¶ 162, 164.   This shows that Ms. Brown has been chilled in exercising her rights.  *See Lederman v. Adams*, 45 F. Supp. 2d 259, 269 (S.D.N.Y. 1999) (denying summary judgment where plaintiff "continued his advocacy activities in general" but "was unable to continue his demonstration and his First Amendment activities were cut short"); *Anderson*, 817 F. Supp. 2d at 97 ("A jury could find that plaintiff's arrest and confinement were sufficient to constitute actual chilling of his First Amendment right to speak out against police officers.").

## IV.    Defendants Are Not Entitled to Qualified Immunity on Plaintiff's Federal Claims

Qualified immunity "shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Kerman v. City of N.Y.*, 374 F.3d 93, 108 (2d Cir. 2004).  Defendants do not argue that the rights at issue were not clearly established, as undoubtedly they were.  Instead, they argue that their conduct was objectively reasonable.  However, as discussed above, there are disputed issues of material

---

[8] Nevertheless, Officers Naimoli and Plevritis testified that they had no idea that Ms. Brown was associated with OWS.  Given all the evidence to the contrary, a rational juror could infer that they were being dishonest about their ignorance of Ms. Brown's affiliation with OWS and, accordingly, that they were hiding their true motivation for her arrest. *Cf. Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) ("the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose").

fact regarding these claims that foreclose summary judgment.  *Id.* ("Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual questions must be resolved by the factfinder." (citations omitted)).

## V.    State Law Claims

### A.    Constitutional claims

Plaintiff's state constitutional claims fall squarely within the holding of *Brown v. State*, 89 N.Y.2d 172 (1996), that there is an implied damages remedy for violations of the "Search and Seizure Clauses of the State Constitution." *Id.* at 187.  Defendants' contention that Plaintiff's state constitutional claims fail because of the availability of common-law false arrest and false imprisonment claims disregards *Brown*'s teachings:

> Nor should claimants' right to recover damages be dependent upon the availability of a common-law tort cause of action. Common-law tort rules are heavily influenced by overriding concerns of adjusting losses and allocating risks, matters that have little relevance when constitutional rights are at stake. Moreover, the duties imposed upon government officers by these provisions address something far more serious than the private wrongs regulated by the common law. To confine claimants to tort causes of action would produce the paradox that individuals, guilty or innocent, wrongly arrested or detained may seek a monetary recovery because the complaint fits within the framework of a common-law tort, whereas these claimants, who suffered similar indignities, must go remediless because the duty violated was spelled out in the State Constitution.

*Id.* at 191.  Accordingly, the Defendants are not entitled to summary judgment on these claims.[9]

---

[9] Defendants misplace reliance on *Martinez v. City of Schenectady*, 97 N.Y.2d 78 (2001), which held that *Brown* did not require a damages remedy where the plaintiff could vindicate her state constitutional rights in another manner.  In *Martinez*, plaintiff had vindicated the violation of her constitutional rights through the suppression of the evidence of her wrongdoing.  *Id.* at 83-4.  Here, Plaintiff has not vindicated her state constitutional rights, and has no alternate avenue of redress for the violations of those rights.  Defendants also mistakenly rely on *Lyles v. State*, 2 A.D.3d 694, 695 (2d Dept. 2003), but fail to explain that the Court of Appeals granted leave in that case and expressly declined to "address the issue of whether a constitutional tort action may be maintained where alternative common-law tort remedies exist and instead decided the case on alternative grounds.  *Lyles v. State*, 3 N.Y.3d 396, 401 (2004).  Thus, *Brown* is still controlling law on this issue.

### B. Common law claims

Defendants are wrong that Plaintiff's state law assault and battery claims are untimely because they were not brought within the one year statute of limitations set forth in New York Civil Procedure Law and Rule ("C.P.L.R.") § 215(3).  "[A] one year and ninety-day period for filing suit against municipalities and their employees clearly applies in this case."  *Barnett v. Dillon*, 890 F. Supp. 83, 87 (N.D.N.Y. 1995) (citing Gen. Mun. Law § 50-i; *Drake v. City of Rochester*, 96 Misc.2d 86, 93 (1978); *Szerlip v. Finnegan*, 77 Misc. 2d 655, 657 (1974) (Gen. Mun. Law § 50-i supersedes C.P.L.R. § 215), *aff'd*, 47 A.D.2d 603 (2d Dep't 1975)).  Defendants cite three cases, Defs.' Mot. 23-24, which do not involve claims against municipal employees and do not mention Gen. Mun. Law § 50-i, and are therefore inapposite.

Plaintiff's assault and battery claims survive summary judgment for the same reasons that her § 1983 false arrest and excessive force claims do.  *See Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991) ("except for § 1983's requirement that the tort be committed under color of state law, the essential elements of [a § 1983 excessive force claim and state law assault and battery] were substantially identical").  Defendants are also mistaken that Plaintiff's negligence and emotional distress claims must be dismissed.  The law in New York is that a common-law negligence claim may proceed against an officer for excessive force.  *See McCummings v. N.Y. City Transit Auth.*, 81 N.Y.2d 923 (1993).  Likewise, intentional infliction of emotional distress claims may proceed against officers for excessive force.  *See Bender v. City of N.Y.*, 78 F.3d 787, 788-89 (2d Cir. 1996); *Eckardt v. City of White Plains*, 87 A.D.3d 1049, 1051 (2d Dep't 2011).

### C. State law immunity

Defendants argue that "the officers are entitled to even greater immunity" on Plaintiff's state law claims and assert that "decisions and actions regarding an arrest are inherent to the

24

nature of being a police officer and immunity must attach." Defs.' Mot. 22. This boundless argument—that New York officers are always immune from state law liability for false arrests—is incorrect. "The standard for determining whether police officers enjoy immunity for false arrest and assault and battery actions is the same under state law as it is under federal law." *Graham v. City of N.Y.*, 928 F. Supp. 2d 610, 625 (E.D.N.Y. 2013); *see also Bancroft v. City of Mt. Vernon*, 672 F. Supp. 2d 391, 401 (S.D.N.Y. 2009) ("[A]n officer's entitlement to qualified immunity under New York law depends on the reasonableness of his actions."). "The only difference between the federal and state [immunity] doctrines is that the reasonableness of an officer's action is judged with references to state law . . . ." *Bancroft*, 672 F. Supp. 2d at 401.[10]

Moreover, Defendants fail to acknowledge that even under the officers' view of the facts, their arrest of Plaintiff violated New York Criminal Procedure Law § 140.10. That statute allows for an arrest for a violation, which is what the officers here claim to have arrested Plaintiff for, only where the officer has personally observed the conduct constituting the offense. The officers admit that they understood this provision. Pl.'s 56.1 ¶ 105. Thus, under no view of the facts can it be said that the officers' conduct was reasonable.

## CONCLUSION

For the foregoing reasons, and based on the matters set forth in the accompanying papers, Plaintiff requests that the Court deny Defendants' motion for summary judgment.

---

[10] Defendants' reliance on *Estate of Yankel Rosenbaum v. City of New York*, 982 F. Supp. 894 (E.D.N.Y. 2007), is misplaced. That case involved application of the "judgment error theory," *see id.* at 896, which applies "to 'discretionary or quasi-judicial acts [that] involve the exercise of reasoned judgment which could typically produce different acceptable results,'" *Graham*, 928 F. Supp. 2d at 626 n.8. "This theory is not applicable when the officers fail to follow procedures," and "[f]alse arrest and excessive force would be outside of New York City procedures." *Id.* Thus, the theory is inapposite to claims of false arrest and excessive force. *Id.* (citing additional cases concluding that "that the judgment error rule does not protect uses of force that go against police procedure").

Dated: New York, NY
April 18, 2014

Respectfully submitted,

BELDOCK LEVINE & HOFFMAN LLP


/s/ Joshua S. Moskovitz

*Attorneys for Plaintiff Imani Brown*

26