**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X

IMANI BROWN,

                                        Plaintiff,

        -against-

THE CITY OF NEW YORK, a municipal entity; and
New York City Police Officers JUSTIN NAIMOLI
(Shield #26063) and THEODORE PLEVRITIS, in
their individual capacities,

                                        Defendants.

------------------------------------------------------------------ X

**PLAINTIFF'S RESPONSE
TO DEFENDANTS' LOCAL
RULE 56.1 STATEMENT
AND STATEMENT OF
ADDITIONAL MATERIAL
FACTS**

No. 13-cv-1018 (KBF)

Pursuant to Local Civil Rule 56.1, Plaintiff Imani Brown hereby responds to Defendants'

Local Rule 56.1 Statement, and sets out her statement of additional material facts in opposition

to Defendants' motion for summary judgment.   The exhibits, Declaration of Plaintiff Imani

Brown in Opposition to Defendants' Motion for Summary Judgment ("Brown decl."), and

Attorney Affirmation of Andrew Lucas, dated April 17, 2014 ("Lucas Aff.") referenced herein,

unless otherwise noted, are annexed to the accompanying April 18, 2014 declaration of Joshua S.

Moskovitz ("Moskovitz decl.").

I.      **Plaintiff's Response to Defendants' Proposed Undisputed Material Facts**

1.      Plaintiff disputes this fact.   She testified that she attended an event at Blue

Stocking Cafe on November 14, 2011, not November 15, and did not recall what time she left the

event.  Ex. 1 (24:17 – 25:2, 30:20-21).

2.      Plaintiff disputes this fact.   She did not testify that the text message was received

while she was at Blue Stocking Cafe; she testified that she did not recall what time the message

was received.  Ex. 1 (24:3-8, 26:12-15)

3.      Plaintiff does not dispute this fact.

4.      Plaintiff does not dispute this fact.

5.      Plaintiff does not dispute this fact.

6.      Plaintiff does not dispute this fact.

7.      Plaintiff does not dispute these facts, but she also read *Madness and Civilization* by Michel Foucault.  Ex. 1 (34:8-9).

8.      Plaintiff does not dispute these facts.

9.      Plaintiff does not dispute these facts.

10.     Plaintiff does not dispute this fact.

11.     Plaintiff does not dispute these facts.  When Plaintiff knocked on the door, she "was knocking, in the typical manner of knocking on a door" and "made a hello, waving gesture with [her] hands and made a prayer gesture."  Ex. 1 (38:8-9).

12.     Plaintiff does not dispute these facts.

13.     Plaintiff does not dispute these facts.

14.     Plaintiff does not dispute this fact but notes that she did not scream; instead, her voice may have been elevated simply to get the attention of the Starbucks employees when she was asking them to come to the door, and she did not use any profanity.  Ex. 1 (58:22 – 59:9).

15.     Plaintiff does not dispute these facts.

16.     Plaintiff does not dispute this fact.

17.     Plaintiff does not dispute these facts.  The other individual who arrived was also waiting for the Starbucks to open so that she could use the bathroom.  Ex. 1 (37:8-10, 40:10-12).

18.     Plaintiff does not dispute this fact, other than to clarify that Plaintiff did not recall anyone else other than herself, Mr. Sagan, or the third person waiting on the sidewalk in front of the Starbucks before the police arrived.  Ex. 1 (40:13-21).

19.     Plaintiff does not dispute that she did not see anyone else knocking on the Starbucks door, but disputes Defendants' attempt to make it appear as if Plaintiff testified that she was "banging" on the Starbucks door.  Plaintiff testified that she knocked on the Starbucks door "in the typical manner of knocking on a door."  Ex. 1 (38:8-9).  She did not testify that she was "banging" on the Starbucks door and Plaintiff's counsel objected to both times that Defendants' counsel asked Plaintiff if she saw anyone "else" banging on the Starbucks door.  Ex. 1 (40:22 – 41:7).

20.     Plaintiff does not dispute this fact.

21.     Plaintiff does not dispute this fact, although disputes that she was ever "knocking on the door really really bad" or "making nasty comments" or that anyone else who was there while she was present was doing those things.  Ex. 1 (36:9 – 41:7); *supra* ¶ 19.

22.     Plaintiff does not dispute this fact, although disputes that anything she did, or anything she saw anyone else do, would have interfered with the store opening.  Ex. 1 (36:9 – 41:7).

23.     Plaintiff disputes this fact.  Torres told the 911 operator that there were six people outside the store, not that there were six people knocking on the door.  Ex. 16 (911 call) (00:22-0037).  Plaintiff also disputes that there were six people knocking on the door of the Starbucks at any point that she was present.  Ex. 1 (40:25 – 41:2).

3

24.     Plaintiff disputes these facts.   Torres never told the 911 operator that anyone knocking on the door was being aggressive or angry, nor did he tell the operator that he was concerned for the safety of employees coming to work.  Ex. 16 (911 call).

25.     Plaintiff disputes these facts.   Plaintiff had two interactions with a female Starbucks employee.  Ex. 1 (36:15-19, 38:23-24).  Neither Plaintiff nor Johnny Sagan, who was at the Starbucks with Plaintiff on November 15, 2011, knew that someone from Starbucks had called 911.  Ex. 1 (81:17-22); Ex. 4 (28:2-4, 50:19-21).

26.     Plaintiff disputes this fact.   Torres never told the 911 operator that he was concerned that the doors might be forced open, and he went about his usual business of preparing the store to open while he said the people were outside the door.   Torres appears to have been focused on preventing the people outside from being allowed to use the store bathroom.  During the 911 call, Torres can be heard telling another Starbucks employee, Donna, to lock the bathroom doors from the outside.  Ex. 16 (911 call) (00:44-00:48, 01:14-01:15); *see also* Ex. 3 (41:8 – 43:7) ("Q. Why did you tell her to lock the bathroom door from the outside? A. Because I heard the banging on the doors . . . [t]he outside doors."); Ex. 3 (45:23-25).

27.     Plaintiff does not dispute these facts.

28.     Torres' 911 call was not transmitted directly to Defendants Plevritis and Naimoli, nor does the evidence cited by Defendants support that assertion.   Instead, the radio dispatcher sent a radio transmission in her own words regarding the 911 call.

29.     Plaintiff does not dispute that the quoted words are the words the radio dispatcher used to describe the 911 call.

30.     Plaintiff does not dispute these facts.

31.     Plaintiff disputes these facts.  First, the officers did not know the 911 caller's name, they only asked for a callback.  Ex. 17 (11:18).  Second, Officer Naimoli testified that they asked for the callback while they were sitting in their car in front of the Starbucks and were sitting there for a couple of minutes.  Ex. 2 (142:2-11, 143:3-11).

32.     Plaintiff does not dispute that the radio dispatcher made two calls to the 911 caller.   At 05:11:25, the dispatcher placed a phone call that went unanswered.   Ex. 17 (11:25-12:02).  Torres testified that he did not remember missing that call.  Ex. 3 (45:4-10).  At 05:12:19, the radio dispatcher called and spoke with Torres for several seconds.  Ex. 17 (12:02-12:29).  Approximately one minute and ten seconds elapsed between the officers' request for a callback and the dispatcher's brief conversation with Torres.

33.     Plaintiff does not dispute these facts.

34.     To the extent the fact asserted here is that the officers arrived at the Starbucks between 5:07 and 5:11 a.m., Plaintiff disputes this fact.  The evidence cited by Defendants shows that the officers arrived at 5:11 a.m.  Ex. 10 (Sprint Report) (showing car "1E" as "10-84," the police code for "arrived at scene," at "0511").   Defendant Naimoli testified that the officers radioed for a callback to the 911 caller while they were sitting in their car outside the Starbucks and that radio transmission was recorded at 5:11:18.  Ex. 17 (11:03-11:22); Ex. 2 (142:2-5).

35.     Plaintiff disputes these facts.  Defendant Naimoli testified that when the officers arrived there were three to five people in front of the Starbucks "off a little bit to the side" "[j]ust standing around there."  Ex. 2 (141:6-13, 143:17-19, 145:23-24) ("Q. What were they doing? A. Standing there.").  Plaintiff testified that the only people waiting near the Starbucks when the police arrived were herself, Mr. Sagan, and a third person.  Ex. 1 (40:13-15).   The video

evidence shows only Mr. Sagan and another person standing by the Starbucks when the officers are beginning to arrest Plaintiff.  Ex. 18 (00:00-00:05).

36.     Plaintiff disputes this fact.  *See* Ex. 3 (15:16-20).

37.     Plaintiff disputes this fact.  Plaintiff testified that she approached the officers in their car when they first arrived; she spoke with them; they got out of their car; they demanded her ID; and when she refused, they arrested her.  Ex. 1 (41:17 – 49:25).   Plaintiff testified unequivocally that the officers did not go to the Starbucks before arresting her: "Q. Did you see either of the officers go to the door of Starbucks? A. No. Q. Did you see either of the officers speak to any of the Starbuck's employees? A. No. Q. So the officers arrived, got out of their car and approached you directly? A. Yes, I'm sorry, I approached them. Q. Initially, and when they got out of the car, they approached you directly; is that fair? A. Yes."  Ex. 1 (46:20 – 47:6).  Moreover, the officers and Torres testified that they had one conversation and the video evidence shows them speaking *after* the officers arrested Plaintiff.  *See infra* ¶¶ 96-97.

38.     Plaintiff disputes that either of the officers spoke with someone in the Starbucks before arresting her.  *See supra* ¶ 37.  Moreover, the officers gave inconsistent testimony that casts doubt on when this conversation with the Starbucks employee took place and what was discussed.  Officer Plevritis testified that he spoke with Officer Naimoli two weeks before his deposition to ask if Officer Naimoli had spoken with the 911 caller, because Officer Plevritis could not remember, and Officer Naimoli told him that he had spoken with the 911 caller.  Ex. 5 (17:2 – 18:9).  Yet, Officer Naimoli denied having this conversation with Officer Plevritis.  Ex. 2 (23:10 – 24:13).  And Officer Naimoli testified that he could not recall if it was him or Officer Plevritis who spoke with the Starbucks employee.  Ex. 2 (147:8-15); *see also infra* ¶ 40 (Officer Plevritis gave inconsistent testimony about the substance of his conversation with Torres).

39.     Plaintiff disputes that either of the officers spoke with someone in the Starbucks before arresting her. *See supra* ¶ 37. Plaintiff also disputes that Torres was fearful of the people outside the Starbucks and disputes that he told the officers that he was scared they would break the door. *See supra* ¶ 26.

40.     Plaintiff disputes that either of the officers spoke with someone in the Starbucks before arresting her, *see supra* ¶ 37, and disputes that there was a "group" in front of the Starbucks, *see supra* ¶ 35. Plaintiff also disputes the assertion that Torres indicated Plaintiff specifically to the officers. Officer Plevritis expressly denied that this happened when he was first asked in his deposition. Ex. 5 (88:4-15) ("Q. Did he point out any of the people that he said were banging on the door? A. He said, 'This group here, these people were,' and he motioned with his hand that the people here were the ones that were trying to kick in his door. Q. He gestured at them? A. Yes. Q. Did he point to any specific person and say this person was doing this particular thing? A. Not that I remember."). Defendants carefully omit these lines of Officer Plevritis' deposition in their Rule 56.1 Statement. Officer Plevritis gave other inconsistent testimony about this conversation with Torres, which casts further doubt on his veracity. Initially, Officer Plevritis testified that during this conversation he did not ask Torres any questions. Ex. 5 (87:22-23). Later, Officer Plevritis changed his testimony and claimed that he asked Torres "[t]wo or three" questions during that conversation. *Id.* (225:5-24). Conveniently, one of those questions was who specifically had kicked on the Starbucks door. *Id.* (225:9-24).

41.     Plaintiff disputes these facts. *See supra* ¶¶ 35, 37.

42.     Plaintiff disputes these facts. *See supra* ¶ 37.

43.     Plaintiff does not dispute this fact.

44.     Plaintiff does not dispute these facts.

45.     Plaintiff does not dispute these facts, but they are incomplete.  When Plaintiff asked the officers if they knew where she could use the bathroom, they replied sarcastically, "what do we look like, the potty police?"  Ex. 1 (42:8-13).  Plaintiff replied "no, of course not, but [I] figured that [you] would know the area better than I did and wondered if [you] could help."  *Id.* (42:17-19).  The officers responded by telling Plaintiff "to go piss in the park."  *Id.* (42:20-21).  Plaintiff asked "isn't that illegal, won't you arrest me for doing that?" and the officers responded, "yes."  *Id.* (43:5-7).

46.     Plaintiff does not dispute that the officers told her that she should go home, but they told her that in response to her question "so you are just not going to help me, you don't have anything you can offer me, any advice you can offer me?"  Ex. 1 (43:9-13).  The officers had no lawful basis to order Plaintiff to leave, and she explained that she lived over an hour away and the Starbucks would be open soon and so she would wait.  *Id.* (43:21-22).

47.     Plaintiff does not dispute this fact.

48.     Plaintiff does not dispute these facts.

49.     Plaintiff does not dispute this fact.

50.     Plaintiff disputes that she "refused" to provide her identification.  When the officers asked for her identification, Plaintiff "responded with confusion and fear" and "asked, on what grounds" "[s]everal times," the officers never gave her any explanation, and Plaintiff declined to give them her ID.  Ex. 1 (48:6-14, 49:1, 49:24 – 50:2).

51.     Plaintiff "repeatedly asked," "[s]everal times," on what grounds the officers were asking her for her identification.  Ex. 1 (48:9-12, 49:24-25).  The officers never responded.  *Id.* (48:13-14).

52.     Plaintiff disputes that the officers told her to go home after they asked for her identification.  Defendants cite Plaintiff's 50-h hearing testimony for this proposition, but the order of questions asked during that hearing was out of sequence.  Plaintiff's deposition testimony is clear that she told the officers she could not go home while they were still in their car, that they then exited their car and demanded her ID, that she asked them on what grounds and they did not respond, that she refused to give her ID, and that they put her under arrest at that point.  Ex. 1 (43:17 – 49:25).

53.     Plaintiff testified that the officers said "we were going to give you a citation, but now you are going to jail."  Ex. 1 (48:23-24).

54.     Plaintiff does not dispute this fact.

55.     Plaintiff does not dispute that she asked repeatedly why she was being arrested, and was not offering her arms by keeping them close to her person.

56.     Plaintiff does not dispute these facts, but averts that they are incomplete and misleading.  Sagan also said "she's just a young lady who trying to use the bathroom," Ex. 18 (00:05-00:09), and the officers never warned Plaintiff that they would kick her legs out and throw her to the ground before they did.  Ex. 18 (00:17-00:21).   Further, the officers had no right to throw Plaintiff to the ground, and their out-of-court statements that Plaintiff was "resisting" provides no evidence that Plaintiff was in fact resisting, and are inadmissible hearsay to prove that fact, and were said to justify their otherwise unjustified conduct.

57.     Plaintiff does not dispute that the officers violently kicked her to the ground. Ex. 18 (00:18-00:21).

58.     Plaintiff does not dispute this fact, but it is not material at this time.

59.     Sagan did not testify that he could not state what happened; he testified that he could not "really recall" what happened.  In any event, this is not a material fact.

60.     Plaintiff does not dispute that the officers said to give them her hands, but the video shows that before they threw Plaintiff to the ground, Officer Naimoli had placed one of Plaintiff's arms in handcuffs and at various points while the officers pressed Plaintiff into the ground, Officer Plevritis had one of Plaintiff's arms twisted behind her back.  Ex. 18 (00:10, 00:30-00:40, 00:59-01:03).  Plaintiff was in no position to give them her hands as they were twisted behind her back.  Further, the officers' out-of-court statements provide no evidence that Plaintiff was resisting, and are inadmissible hearsay to prove that fact, and were said to justify their otherwise unjustified conduct.

61.     Plaintiff does not dispute that the officers said to Plaintiff "stop resisting," but these out-of-court statements provide no evidence that Plaintiff was resisting, are inadmissible hearsay to prove that fact, and were said to justify their otherwise unjustified conduct.  Moreover, Plaintiff disputes whether she was resisting and disputes whether the officers' force was reasonable or necessary.  Ex. 18.  The video also reveals several statements by witnesses that Plaintiff was not resisting.  Ex. 18 (1:51-01:56).

62.     Plaintiff does not dispute that at one point she was afraid that the contents of her purse had been scattered and she trying to keep her phone and wallet from being lost, but the officers had hold of Plaintiff's arms at various points and were constantly pressing her into the ground.  Ex. 18 (00:21-01:03).

63.     Plaintiff does not dispute that she was pepper spray twice, but disputes that it was before she was handcuffed.   As the video shows, Defendant Naimoli had placed one of

Plaintiff's wrists in handcuffs before she was thrown to the ground and before she was pepper sprayed.  Ex. 18 (00:10).

64.   Plaintiff does not dispute that the officers can be heard on the video saying "stop resisting" but these out-of-court statements provide no evidence that Plaintiff was resisting, are inadmissible hearsay to prove that fact, and were said to justify their otherwise unjustified conduct.  The video also reveals several statements by witnesses that Plaintiff was not resisting. The video demonstrates that Plaintiff was not resisting but was simply responding to an unexpected and unjustified assault on her.  Ex. 18.

65.   Plaintiff does not dispute that the officers can be heard on the video saying "stop it" but these out-of-court statements provide no evidence that Plaintiff was resisting, are inadmissible hearsay to prove that fact, and were said to justify their otherwise unjustified conduct.  The video also reveals several statements by witnesses that Plaintiff was not resisting. The video demonstrates that Plaintiff was not resisting but was simply responding to an unexpected and unjustified assault on her.  Ex. 18.

66.   This paragraph asserts the same fact as paragraph 60.  *See supra* ¶ 60.

67.   Plaintiff does not dispute that one of the officers can be heard on the video making this statement, but disputes whether it was a warning.  The video shows that at that point the statement was made, Officer Naimoli had already placed one of Plaintiff's arms in handcuffs and Officer Plevritis had one of Plaintiff's arms twisted behind her back.  Ex. 18.  Thus, Plaintiff was not in a position to give the officers her hands, and this statement was made to justify the officers' otherwise unjustified conduct

68.   Plaintiff does not dispute that this fact.

69.     It appears from the video, which is the only evidence cited by Defendants, that the duration of the discharge of the pepper spray is at least one second and possibly longer.

70.     Plaintiff does not dispute that Officer Plevritis radioed for backup while he and Officer Naimoli were holding Plaintiff on the ground.

71.     Plaintiff does not dispute that Sagan can be heard on the video making these statements, which include the statement "the police came here and they were angry at her."

72.     Plaintiff does not dispute that the officers can be heard on the video saying these things, but these out-of-court statements provide no evidence that Plaintiff was resisting, are inadmissible hearsay to prove that fact, and were said to justify their otherwise unjustified conduct.  The video also reveals several statements by witnesses that Plaintiff was not resisting. The video demonstrates that Plaintiff was not resisting but was simply responding to an unexpected and unjustified assault on her.  Ex. 18.

73.     Plaintiff does not dispute that her skirt had come up, exposing her lower body, and that she attempted to pull her skirt down.  Ex. 18.

74.     Plaintiff does not dispute that Officer Plevritis can be heard on the video saying menacingly "you're gonna get it again, you're going to get it again" just before he grabs Plaintiff's downturned head, pushes her face up, and sprays her directly in the face with pepper spray from within a foot.  Ex. 18 (02:00-02:18); Ex. 1 (55:9-13).  When Officer Plevritis did this, Plaintiff was kneeling in place on the ground and being held by Officer Naimoli.   Ex. 18 (02:00-02:18) Plaintiff disputes Defendants' characterization that what Officer Plevritis said was a "warning."

75.     Plaintiff disputes this fact.  While Plaintiff testified that she had been warned that she would be pepper sprayed a second time, the video reveals no such warning.  Ex. 18 (02:10-02:15).

76.     Plaintiff disputes this fact.  It is unclear from the video, which is the only evidence cited by the Defendants, how long the second dose of pepper spray was.

77.     Plaintiff does not dispute that the officers can be heard on the video saying these things, but these out-of-court statements provide no evidence that Plaintiff was resisting, are inadmissible hearsay to prove that fact, and were said to justify their otherwise unjustified conduct.

78.     Plaintiff does not dispute these facts, but she also offered her arms because her skirt had risen above her butt and she realized "that the only way I could regain my dignity and move on out of this current situation would be to just allow them to put me in the car."  Ex. 1 (56:1-10).

79.     Plaintiff does not dispute this fact.

80.     Plaintiff does not dispute that she was kicked to the ground.  Ex. 1 (57:5-20); Ex. 18 (00:18-00:21).  The video also shows Officer Plevritis kneeing Plaintiff when she is on the ground and she can be heard saying "don't kick me."  Ex. 18 (00:48-00:53).

81.     Plaintiff disputes this fact.  Defendant Plevritis' testimony that he did not believe that the individuals waiting outside of Starbucks to use the bathroom early in the morning on November 15, 2011, were part of the OWS events is incredible.  When asked why people would be waiting at 5 a.m. for a Starbucks in lower Manhattan to open he answered, "[p]eople go drinking; they're still out late"; but he acknowledged that November 15, 2011 was a weekday.  Ex. 5 (184:14-20).  He testified, unbelievably, that it did not even cross his mind that these

people had come from Zuccotti Park where there had been a large police operation to evict OWS protestors, and throngs of people were protesting throughout lower Manhattan that night. *Id.* (184:21-25). Officer Naimoli admitted that the streets in the First Precinct in lower Manhattan are generally quiet at 5 a.m. on a weekday, but there was a lot of activity and many people out on November 15, 2011. Ex. 2 (208:2-16). Officer Naimoli admitted that he could have assumed or inferred that this activity and these people were involved with OWS. *Id.* (208:24 – 209:8). Torres, the Starbucks manager, testified that the people outside his store that morning appeared to be OWS protestors based on their clothing and items they had. Ex. 3 (39:9-24).

82.     Plaintiff does not dispute that she was thrown into the back of the police car face first while her hands were cuffed behind her, and later transported to the First Precinct. However, after she was placed in the police car and before she was taken to the precinct, Officer Plevritis ordered Plaintiff to get out of the patrol car, and when Plaintiff said "I can't, I can't see," Officer Plevritis responded "good" and pulled her by the arm out of the car. Ex. 18 ) (00:01-00:05).

83.     Plaintiff does not dispute that one of the officers called for EMS, but disputes which officer called. The evidence cited by Defendants does not reflect which officer called, Officer Plevritis did not testify about which officer called, and Officer Naimoli testified that he did not recall which officer called. Ex. 2 (183:16-22).

84.     Plaintiff does not dispute these facts.

85.     When Plaintiff arrived at Central Booking, officers advised her "that I would be asked whether I needed medical attention and that I should reply no because if I said I needed medical attention the booking process would have to be halted, I would have to go to the hospital

and that the whole process could be delayed for up to three days"; and so, "[a]t their advice," she did not request medical attention. Ex. 1 (65:14-21).

86.      When Plaintiff was placed in a cell at the precinct she "was crying, sobbing and beginning to have a panic attack and the EMS personnel came up and said that [she] had been pepper sprayed quite a bit and [she] needed to have [her] eyes rinsed and [she] said, ['Jno, I don't want anyone to touch me anymore.[']"  Ex. 1 (63:23 – 64:9).

87.      Plaintiff does not dispute these facts.

88.      Plaintiff was charged with Resisting Arrest under Penal Law 205.30, and Disorderly Conduct under Penal Law § 240.20(1) and (3).  Ex. 12 (criminal complaint).  The Criminal Court Complaint explains subsections (1) and (3) of the disorderly conduct law respectively as "engaged in fighting and in violent, tumultuous and threatening behavior" and "used abusive and obscene language and made an obscene gesture in a public place," and, for both subsections, "with intent to cause to cause public inconvenience, annoyance and alarm and recklessly causing a risk thereof."  *Id.*  The Complaint, signed under oath by Officer Naimoli, alleges that he personally observed Plaintiff "yelling and screaming and behaving in a violent, tumultuous, and threatening manner" by "banging on the door of Starbucks and screaming" that she needed to use the bathroom.  *Id.*  The Complaint also alleges that Plaintiff's conduct "created a public disturbance/inconvenience in that it caused a crowd to gather and people to express alarm."  *Id.*  However, Officer Naimoli admitted in his deposition that he did not personally observe Plaintiff banging on the door of Starbucks.  Ex. 2 (122:24 – 123:4, 133:12 – 134:13).  He also admitted that when he said he Plaintiff's conduct "caused a crowd to gather" he meant there were people present.  *Id.* (127:2-7, 136:16-25).

Defendants do not cite the Criminal Court Complaint (nor did they submit it with their summary judgment papers), but instead cite the arrest report, which gives a different explanation of Plaintiff's alleged criminal conduct in reference to a different provision of the disorderly conduct law.  The arrest report states that Plaintiff was arrested for violating subsection (6) of the disorderly conduct statute by "refusing to move on."  Ex. 11 (arrest report).   The factual description of Plaintiff's alleged conduct in the arrest report is: "At TPO deft was asked to leave location after causing a disturbance in front of a store. Deft did refuse this order. Deft then asked for her ID and deft did refuse to give ID and responded with profanity." *Id.*  The only conduct that the officers allege Plaintiff had committed when they arrested her was that she had used profane language when speaking to them in their car and refused to leave the area at that point. Ex. 2 (154:13 – 155:19); Ex. 5 (100:2-16).

89.    This fact is immaterial as Plaintiff has not brought a malicious prosecution claim. Nonetheless, Plaintiff does not dispute that at her second court appearance she made the choice to accept an "ACD" (adjournment in contemplation of dismissal) because she "was concerned about the amount of time it was going to take to go through the repeated criminal trials" since she had "many friends who had been arrested during Occupy and had repeated court cases and I couldn't afford to miss work on a continuous basis."  Ex. 1 (71:12-16).

## II.    Plaintiff's Statement of Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment

90.    When Officers Naimoli and Plevritis arrived at the Starbucks on November 15, 2011, the only information they had received was the radio dispatch that there were "six people banging on the doors refusing to leave at Starbucks coffee" located at 233 Broadway.  Ex. 2 (135:17 – 136:7, 138:2-12); Ex. 5 (64:8 – 66:5); Ex. 17 (05:25-05:44).

91.     The radio dispatch did not describe any individual and did not name Plaintiff. Ex. 2 (135:22 – 136:3, 138:2-12); Ex. 5 (65:19 – 66:5); Ex. 17 (05:25-05:44.

92.     Nothing from the radio dispatch indicated that Plaintiff was banging on the door at Starbucks.  Ex. 2 (136:4-7); Ex. 17 (05:25-05:44).

93.     When the officers arrived at the Starbucks, they did not see anyone banging on the doors of the store.  Ex. 5 (76:24 – 77:6).

94.     The officers never saw Plaintiff banging or kicking on the doors or the glass of the Starbucks, or doing anything illegal when they arrived.  Ex. 2 (122:24 – 123:4, 134:4-13); Ex. 5 (99:14-25).

95.     Officer Naimoli did not see Plaintiff yelling at the Starbuck's employee.  Ex. 2 (206:8-10).

96.     When the officers began to arrest Plaintiff and she asked them why, they never gave her an answer or explanation.  Ex. 1 (49:23 – 50:2, 50:11-19); Ex. 2 (162:6-12); Ex. 5 (105:17-21).

97.     The officers spoke only once with the Starbucks manager, Torres.  Ex. 2 (182:16 – 183:3); Ex. 3 (20:20-22).

98.     The video shows the officers speaking with the Starbucks manager ***after*** Plaintiff was arrested.  Ex. 20.

99.     Officer Plevritis recorded Plaintiff's arrest in his memo book as: "Female Black refuses to leave location and refuses to give ID[.]  Female then resists arrest by flailing her arms and twisting her body. Pepper spray used 2x to restrain female."  Ex. 8.

100.     Officer Naimoli handwrote a "scratch" complaint report at the precinct, Ex. 2 (83:14-24), which Defendants cannot locate, Lucas Aff. ¶ 3.

101.    "Scratch" or handwritten complaint reports are kept in the ordinary course of business in the NYPD, and for arrests in the First Precinct, they are customarily kept in the files of the First Precinct.  *See* Moskovitz Decl. ¶¶ 3-4; Ex. 2 (84:20 – 87:15).

102.    Officer Naimoli prepared an electronic arrest report which described Plaintiff's arrest as: "At tpo deft was asked to leave location after causing a disturbance in front of a store. Deft did refuse this order. Deft was then asked for her ID and deft did refuse to give ID and responded with profanity. While effecting arrest deft did resist by pulling her arms and trying to push away from officers to prevent being handcuffed."  Ex. 2 (111:7 – 112:25); Ex. 11.

103.    In the Criminal Court Complaint that Officer Naimoli filed against Plaintiff, he knowingly and falsely alleged that he personally observed Plaintiff banging on the door of Starbucks.  *Compare* Ex. 7 (Criminal Complaint), *with* Ex. 2 (122:24 – 123:4, 133:12 – 134:13).

104.    Officer Naimoli admitted that he did not personally observe Plaintiff banging on the door of Starbucks and that this statement in the Criminal Court Complaint, which he signed under penalty of perjury, was not true.  Ex. 2 (134:4-13).

105.    Officers Naimoli and Plevritis admit that they can only arrest a person for a violation, such as disorderly conduct, if they have personally observed the conduct constituting the violation.  Ex. 2 (116:14 – 117:2); Ex. 5 (158:15-16, 214:22 – 215:8).

106.    Officer Naimoli claimed that he told the assistant district attorney ("ADA") who drafted the complaint that he had been "informed" that Plaintiff was banging on the door, but the ADA misheard him.  Ex. 2 (134:15-21).

107.    New York County ADA James Lynch screened this case in the Early Case Assessment Bureau ("ECAB") and spoke with Officer Naimoli in drafting the Criminal Court

Complaint.  Ex. 2 (124:12-15, 125:19-24, 126:7-22, 134:15-21); Ex. 7 (13:19 – 14:3, 28:24 – 29:6); Ex. 13.

108.    ADA Lynch would have paid particular attention to what Officer Naimoli, as the arresting officer, told him he personally observed versus what he was informed, because that is a critical fact in a case where an officer has made an arrest for a violation like disorderly conduct. Ex. 7 (24:10-15, 27:4-14).

109.    If Officer Naimoli had told ADA Lynch that he was informed that Plaintiff was banging on the door of Starbucks that would have affected the way he dealt with screening the case: he would have drafted the complaint differently and he would have put the names of any civilian witnesses on the DA Data Sheet.  Ex. 7 (32:5 – 33:23, 35:14-21); Ex. 13 (DA Data Sheet).

110.    The DA Data Sheet mentions no civilian witnesses.  Ex. 13 (DA Data Sheet).

111.    When ADA Lynch is preparing a criminal complaint for an officer to sign, he typically tells them that he is going to fax the complaint to them and to "make sure that everything in it attributed to you is true" and "if it is, sign it and send it back."  Ex. 7 (19:24 – 20:4).  He also typically tells them that if there are any corrections that they can call him back to make those changes, and officers have contacted him to say that there is something that needs to be changed in the complaint.  Ex. 7 (20:5-15).

112.    The only conduct that the officers testified Plaintiff had committed before they arrested her was that she had used profane language when speaking to them in their car and that she refused to leave the area at that point.  Ex. 2 (154:13 – 155:19); Ex. 5 (100:2-16).

113.   Officer Naimoli believed that he can give a "lawful" order to disperse to any group of three or more people together somewhere in public under any circumstances and that it does not matter what they are doing.  Ex. 2 (205:11-20).

114.   The night of November 14 to 15, 2011, the NYPD executed a large-scale operation to evict Occupy Wall Street ("OWS") protestors from Zuccotti Park.  Ex. 2 (68:6-14).

115.   Zuccotti Park is located in the NYPD's First Precinct.  Ex. 2 (61:8-10).

116.   The night of November 14 to 15, 2011, Defendants Naimoli and Plevritis worked their normal midnight shift, 11:15 p.m. to 7:50 a.m., in the First Precinct.  Ex. 2 (58:16-22); Ex. 5 (41:13-19); Ex. 8.

117.   Joseph Taylor was the squad sergeant in the First Precinct for the shift Defendants Naimoli and Plevritis worked the night of November 14 to 15, 2011.  Ex. 2 (60:16-19); Ex. 5 (45:19-21); Ex. 6 (43:20-25, 44:2-5).

118.   Sergeant Taylor spoke at roll call at the beginning of the shift Defendants Naimoli and Plevritis worked on November 14, 2011.  Ex. 5 (186:16-21); Ex. 6 (52:12-14).

119.   Defendants Naimoli and Plevritis were present for roll call when their shift began on November 14, 2011.  Ex. 2 (59:19 – 60:6); Ex. 9.

120.   During roll call on November 14, 2011, Sergeant Taylor told the squad about the NYPD's planned operation to clear out Zuccotti Park that night.  Ex. 6 (52:15-18).

121.   Sergeant Taylor "instructed" the officers "to avoid Zuccotti Park" because the NYPD's Occupy Wall Street detail was handling the operation there and he preferred that his officers were doing their routine patrol jobs.  Ex. 6 (52:19-25 – 53:10).

122.   Defendants Naimoli and Plevritis were aware of the police operation at Zuccotti Park when they started their shift on November 14, 2011.  Ex. 2 (69:2-11).

20

123.    Defendant Plevritis claims that he was unaware of the operation to evict OWS protestors from Zuccotti Park until he first drove by the Park the evening of November 14-15, 2011.  Ex. 5 (48:23-25, 49:2-14).

124.    Defendant Plevritis also claims that this was the first and only time in his eight years as an NYPD officer had he was unaware of a large police operation, such as the eviction of OWS protestors from Zuccotti Park, taking place in his precinct during one of his shifts.  Ex. 5 (48:23 – 51:2).

125.    Defendants Naimoli and Plevritis claimed to be "indifferent" towards OWS protesters and the OWS movement.  Ex. 2 (64:16 – 65:12); Ex. 5 (29:9-14, 35:4-8).

126.    Early in their shift, before 1:00 a.m. on November 15, 2011, Defendants Naimoli and Plevritis disregarded Sergeant Taylor's instructions and went to Zuccotti Park.   Ex. 2 (70:22-24); Ex. 5 (51:3 – 52:14); Ex. 8.

127.    At Zuccotti Park, even though no one had ordered or requested them to help, Defendants Naimoli and Plevritis further disregarded Sergeant Taylor's orders and joined in the efforts to police the OWS protestors being evicted from the park,.  Ex. 2 (70:18-24); Ex. 5 (51:13 – 53:23, 54:17-19).

128.    Defendants Naimoli and Plevritis received no orders about what they should be doing at Zuccotti Park, and never spoke with a supervisor before Officer Plevritis made an arrest. Ex. 5 (53:14-23, 54:17-19).

129.    Defendant Plevritis decided to arrest a person just outside of Zuccotti Park.  Ex. 5 (54:17 – 56:2).

130.    The person resisted arrest by "swinging his arms, turning his body away from [the officers] from allowing [the officers] to place his arms behind him, making his arms stiff."  Ex. 5 (57:23 – 58:6).

131.    The person was a man, approximately 5'9" inches tall and weighed approximately 160 or 170 pounds.  Ex. 5 (56:15-17); Ex. 8 (memo book).

132.    Defendant Plevritis was able to overcome the man's resistance without throwing him to the ground and without pepper spraying him.  Ex. 5 (56:3-14).

133.    Defendant Plevritis is approximately 5'10" tall and weighed approximately 215 pounds on November 15, 2011.  Ex. 5 (56:18-23).

134.    Defendant Naimoli is 5'7" tall and weighed approximately 150 pounds on November 15, 2011.  Ex. 2 (204:9-17).

135.    Plaintiff is approximately 5'6'' tall and weighed approximately 120 pounds on November 15, 2011.  Ex. 1 (10:5-6).

136.    The evening of November 14-15, 2011, and particularly in the early morning hours of November 15, there were many people on the streets of Lower Manhattan around Zuccotti Park—more than usual—due to the NYPD's operation of evicting OWS protestors from the Park.  Ex. 2 (208:2 – 209:8).

137.    The individuals standing in front of the Starbucks when the officers arrived on November 15, 2011, were obviously affiliated with the OWS events around Zuccotti Park.  Ex. 3 (39:9-24).

138.    Officer Plevritis believed that the other people who were at the Starbucks could have been issued a summons or arrested, but he decided to arrest only Plaintiff.  Ex. 5 (158:4 – 159:14).

139.    None of the other people who were at the Starbucks were arrested.    Ex. 5 (157:22-24).

140.    At least four officers responded to the Starbucks shortly after the back-up call was placed. Ex. 5 (157:8-11); Ex. 18.

141.    Officer Plevritis did not ask any of those officers to arrest or issue a summons to any of the other people outside of the Starbucks.  Ex. 5 (158:7-9).

142.    Officer Plevritis has no explanation and there is no particular reason that he decided to not arrest or issue a summons to any of the other people outside of the Starbucks nor ask one of the other officers to do so.  Ex. 5 (158:7 – 159:24).

143.    People had gathered while the officers were arresting Plaintiff.  Ex. 18.

144.    There were several people with video cameras and/or recording devices taking pictures and videos of the officers arresting Plaintiff.  Ex. 18 (02:00-03:30).

145.    There are several techniques that officers have at their disposal to overcome physical resistance, including hands-on compliance techniques such as an arm bar or wrist lock, pressure points, leg sweep, and tackling.  Ex. 2 (30:10 – 34:23).

146.    The arm bar, wrist lock, and pressure points techniques can be used to restrain a person without taking her to the ground.  Ex. 2 (31:5-7, 34:17-23).

147.    After placing one of Plaintiff's hands in handcuffs, and while both officers had hold of Plaintiff, the officers kicked Plaintiff to the ground with a leg sweep.   Ex. 18 (00:18-00:22).

148.    Officer Naimoli does not deny that in arresting Plaintiff, the officers kicked her legs out from under her, causing her to fall to the ground on her knees, pressed her face into the

ground, and sprayed her in the eyes at least twice with pepper spray while they restrained her. Ex. 2 (198:13 – 199:12)

149.    After Plaintiff was handcuffed, while she was kneeling on the ground with the officers holding her, she asked them to please pull her skirt down before they lifted her up so that her lower body would not be completely exposed; Officer Plevritis said "no," and they pulled Plaintiff to her feet, exposing her lower body.  Ex. 1 (56:1 – 56:2); Ex. 18 (03:30-03:45).

150.    The officers pushed Plaintiff into their patrol car face first while her hands were cuffed behind her.  Ex. 18 (03:57-04:00).

151.    Later, Officer Plevritis ordered Plaintiff to get out of the patrol car and began to pull her by the arm; Plaintiff said "I can't, I can't see," and Officer Plevritis responded "good." Ex. 19 (00:01-00:05).

152.    Without justification, Officer Plevritis sprayed Plaintiff with pepper spray twice, and both times from a distance of less than three feet.  Ex. 1 (55:9-13); Ex. 5 (131:6-8); Ex. 18 (01:40-01:50, 02:10-02:15).

153.    The second time that Officer Plevritis sprayed Plaintiff with pepper spray was at very close range, he was standing in front of her while she was knelt on the ground and Officer Naimoli was holding her.  Ex. 18 (02:10-02:15).

154.    Defendant Plevritis falsely claimed that he was approximately three feet away when he sprayed Plaintiff the second time.  Ex. 5 (139:4-11).

155.    The NYPD Patrol Guide includes a procedure, No. 212-95, regarding the "use of pepper spray devices," which states that pepper spray should be discharged "at a minimum distance of three (3) feet."  Ex. 14 (Patrol Guide procedure).

156.    The NYPD provides training material to its officers regarding the proper use of pepper spray which says "**DO NOT** spray [pepper spray] at distances less than 3' to avoid 'HYDRAULIC NEEDLE EFFECT.'"  Ex.15 (training materials).

157.    Sergeant Taylor assessed both Officer Plevritis and Officer Naimoli as "aggressive when it comes to making arrests."  Ex. 5 (193:2-9); Ex. 6 (112:19 – 114:7).

158.    Officer Plevritis and Officer Naimoli both concurred with that assessment, which they believed was accurate.  Ex. 6 (112:19 – 114:7).

159.    In his eight-year career, Officer Plevritis has been involved in over 500 arrests but has only used pepper spray in connection with two arrests other than Plaintiff's.  Ex. 5 (141:2 – 143:5).

160.    At the precinct after her arrest, Plaintiff asked Officer Naimoli what was taking so long. Officer Naimoli responded, in sum and substance, "There aren't any cops available because they're all out dealing with your friends," which Plaintiff understood to mean other people participating in the OWS protests. Brown decl. ¶ 3.

161.    Prior to her arrest, Plaintiff believed that police officers were public officials she could approach for help, but since, she has avoided speaking to police officers and asking for them when she has needed it.  Brown decl. ¶ 4.

162.    Plaintiff's arrest was recorded by several strangers.  The resulting footage remains displayed on Youtube and has aired repeatedly on national television.  Plaintiff's friends, family, and employers have seen these humiliating recordings.  Brown Decl. ¶ 4.

163.    As a result of her arrest and the manner in which she was physically and verbally mistreated, Plaintiff has avoided many OWS demonstrations and other protest activities out of fear that she would be wrongfully arrested and mistreated again.  Plaintiff did not participate in

or attend the OWS-organized "Day of Action" on November 17, 2011 in which thousands of people in New York City participated in public demonstrations and protests, and may have been the largest and most symbolic event organized by OWS.  Brown decl. ¶ 5.

Dated: New York, NY
      April 18, 2014

                                            Respectfully submitted,

                                            BELDOCK LEVINE & HOFFMAN LLP
                                            99 Park Avenue, Suite 1600
                                            New York, New York 10016
                                            (212) 490-0400

                                          /s/ Joshua S. Moskovitz

                                          Joshua S. Moskovitz