UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 1 8 2014

IMANI BROWN,

                                   Plaintiff,

             -v-

CITY OF NEW YORK, et al.,

                                   Defendants.

---------------------------------------------------------------X

13-cv-1018 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On February 13, 2013, plaintiff initiated this action against defendants the
City of New York and police officers Justin Naimoli and Theodore Plevritis, alleging
several violations of plaintiff's constitutional rights in connection with her arrest in
November 2011. Now before the Court is defendants' motion for summary
judgment. (ECF No. 34.) For the reasons set forth below, defendants' motion is
GRANTED.

I.     BACKGROUND

       A.     Factual Background

       The following facts are undisputed unless stated otherwise.

              1.     Events prior to plaintiff's arrest

       On November 15, 2011, plaintiff was with friends when one of them received
a text message stating that Occupy Wall Street ("Occupy") was being evicted from
Zuccotti Park. (Defs.' Local Rule 56.1 Stmt. of Undisputed Fact ("Defs.' 56.1") ¶¶ 1,
2, ECF No. 35; Pl.'s Resp. to Defs.' Local Rule 56.1 Stmt. ("Pl.'s 56.1") ¶¶ 1, 2, ECF

No. 52.) Plaintiff went to Zuccotti Park to witness the events and arrived at approximately 2:00 a.m. (Defs.' 56.1 ¶¶ 4–6, Pl.'s 56.1 ¶¶ 4–6.) At approximately 5:00 a.m., plaintiff left the area around Zuccotti Park with a friend, Johnny Sagan, so that plaintiff could find a bathroom. (Defs.' 56.1 ¶ 8, Pl.'s 56.1 ¶ 8.)

Plaintiff saw a light on at a nearby Starbucks. (Defs' 56.1 ¶ 9; Pl.'s 56.1 ¶ 9.) She approached the Starbucks and knocked on the door and, using an elevated voice, gestured to herself and to an employee inside. (Defs.' 56.1 ¶¶ 11, 14; Pl.'s 56.1 ¶¶ 11, 14.) Sagan described plaintiff as "banging on the door asking them to use their discretion and let her go to the bathroom." (Defs.' 56.1 ¶ 71; Pl.'s 56.1 ¶ 71.) A female employee approached the door, opened it, and told plaintiff that the store was closed; she then walked away. (Defs.' 56.1 ¶ 12; Pl.'s 56.1 ¶ 12.) After bringing Starbucks employees to the door twice, plaintiff decided to wait for the store to open. (Defs.' 56.1 ¶¶ 10–16; Pl.'s 56.1 ¶¶ 10–16.) At least one other individual, in addition to plaintiff and Sagan, arrived in front of the Starbucks and waited with plaintiff. (Defs.' 56.1 ¶¶ 17, 18, 48; Pl.'s 56.1 ¶¶ 17, 18, 48.)

At 5:05 a.m., the assistant manager of the Starbucks, Ismael Torres, called 911; he stated that he had "some people knocking on the door really really bad trying to get in the store to use the bathroom—and they like—you know, making nasty comments. And I can't op—open like this." (Defs.' 56.1 ¶¶ 20–22; Pl.'s 56.1

¶¶ 20–22.)[1]  Plaintiff did not see anyone else knocking on the door to the Starbucks. (Defs.' 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.)

The dispatcher relaying the 911 call informed defendants Naimoli and Plevritis ("the officers") that there were "six people banging on the doors refusing to leave at Starbucks Coffee"; the dispatcher did not specifically identify or name plaintiff or another individual. (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶¶ 29, 91, 92; Defs.' Reply Rule 56.1 Stmt. of Undisputed Fact ("Defs.' Reply 56.1") ¶¶ 91, 92.)  The officers arrived at the Starbucks at approximately 5:10. (Defs.' 56.1 ¶¶ 30, 34; Pl.'s 56.1 ¶¶ 30, 34.)  At least three people were standing outside the Starbucks. (Defs.' 56.1 ¶ 35; Pl.'s 56.1 ¶ 35.)[2]  At the time that the officers arrived, they did not see anyone banging on the doors; the parties dispute whether the officers saw plaintiff yelling at the Starbucks employee. (Pl.'s 56.1 ¶¶ 93–95; Defs.' Reply 56.1 ¶¶ 93–95.)

The officers requested that the dispatcher call Torres back for additional information. (Defs.' 56.1 ¶ 31; Pl.'s 56.1 ¶ 31.)[3]  At 5:12, Torres informed the dispatcher that he had just spoken to the police. (Defs.' 56.1 ¶¶ 32, 33; Pl.'s 56.1 ¶¶ 32, 33.)

---

[1] Torres testified that he told the individuals knocking that he was calling 911, and that he was visible while on the phone. (Defs.' 56.1 ¶ 25.) However, plaintiff and Sagan testified that they did not know that a Starbucks employee had called 911. (Pl.'s 56.1 ¶ 25.)

[2] The parties dispute whether the officers knew or believed that the people outside the Starbucks were part of the Occupy movement. (Defs.' 56.1 ¶ 81; Pl.'s 56.1 ¶ 81.) Plevritis testified that he did not believe that the people outside Starbucks were part of Occupy; plaintiff argues that this testimony was not credible for several reasons, and cites Torres's testimony that the people outside the Starbucks did appear to be Occupy protestors. (Pl.'s 56.1 ¶ 81.)

[3] According to defendants, the officers got out of the car and spoke to Torres, who informed them that plaintiff banging on the door had made him fearful and concerned for the store property; the officers then ordered the group to disperse. (Defs.' 56.1 ¶¶ 36–40, 42.) However, plaintiff disputes that either of the officers spoke to Torres before arresting her, and also disputes that the officers ordered the group to disperse before getting back in the car. (Pl.'s 56.1 ¶¶ 36–40, 42.)

2.      Plaintiff's arrest

Plaintiff approached the officers and asked where she could use a bathroom; the officers did not direct her to a bathroom, and directed plaintiff to leave the area and to "go home." (Defs.' 56.1 ¶¶ 45, 46; Pl.'s 56.1 ¶¶ 45, 46; Decl. of Andrew Lucas in Supp. of Defs.' Mot. for Summ. J. ("Lucas Decl.") Ex. B, at 32:12–19, 34:17–20, Ex. F, at 43:8–13, ECF No. 36.)[4]  Plaintiff told the officers that she could not go home and refused to leave the area. (Defs.' 56.1 ¶¶ 47, 52; Pl.'s 56.1 ¶¶ 47, 52; Lucas Decl. Ex. F, at 43:17–22.) In a subsequent online chat, plaintiff stated that she "refused to move." (Supp. Decl. of Andrew Lucas ("Lucas Supp. Decl.") Ex. 1, ECF No. 57.)

The officers exited the car, informed plaintiff that Starbucks had called them, and asked for her identification, which she declined to provide. (Defs.' 56.1 ¶¶ 49–51; Pl.'s 56.1 ¶¶ 49–51.) The officers told plaintiff that they were going to place her under arrest and send her to jail. (Defs.' 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.) They then grabbed her arm to place her under arrest. (Defs.' 56.1 ¶ 54; Pl.'s 56.1 ¶ 54.) Plaintiff did not voluntarily place her hands behind her back or otherwise offer her arms to be handcuffed. (Defs.' 56.1 ¶ 55; Pl.'s 56.1 ¶ 55.)

In the process of arresting plaintiff, the officers asked her to stop resisting them at least four times. (Defs.' 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.) Sagan said, "Please don't put her on the floor, just please let her go." (Id.) Plevritis replied, "No, she's under arrest," then said, "Stop moving your arms, stop resisting, miss, stop

---

[4] The parties dispute the specifics of the conversation that occurred between plaintiff and the officers. (Defs.' 56.1 ¶¶ 45, 46; Pl.'s 56.1 ¶¶ 45, 46.)

4

resisting. Miss, stop resisting. All right, you're going to the ground now." (Id.)[5]
The officers took plaintiff to the ground. (Defs.' 56.1 ¶ 57; Pl.'s 56.1 ¶ 57.) After
being taken to the ground, plaintiff did not offer her arms; she was afraid that the
contents of her purse had been scattered, and she was trying to keep her phone and
wallet from being lost. (Defs.' 56.1 ¶ 62; Pl.'s 56.1 ¶ 62.) After taking plaintiff to
the ground, plaintiff continued to resist; the officers told plaintiff to stop resisting
14 times, to "stop it" five times, and to give over her hands. (Defs.' 56.1 ¶¶ 64–66;
Pl.'s 56.1 ¶¶ 64–66; Lucas Decl. Ex. M.) According to plaintiff, witnesses made
several statements that plaintiff was not resisting. (Pl.'s 56.1 ¶¶ 64, 65, 72.) In the
aforementioned online chat, plaintiff stated that she "resisted arrest." (Supp. Decl.
of Andrew Lucas ("Lucas Supp. Decl.") Ex. 1, ECF No. 57.)

One of the officers said to plaintiff, "Give us your hands or you're going to get
pepper-sprayed right now." (Defs.' 56.1 ¶ 67; Pl.'s 56.1 ¶ 67.) One of the officers
then pepper-sprayed plaintiff for approximately one second. (Defs.' 56.1 ¶ 69; Pl.'s
56.1 ¶ 69.) Plaintiff continued to resist; the officers told plaintiff multiple times to
stop resisting and to place her hands behind her back. (Defs.' 56.1 ¶ 72; Pl.'s 56.1 ¶

---

[5] Plaintiff argues that the officers' orders to plaintiff to stop resisting are inadmissible to prove that
she was resisting. (Pl.'s 56.1 ¶¶ 60, 62–64.) Plaintiff also argues that her arms were twisted behind
her back such that she could not offer them to be handcuffed. (Pl.'s 56.1 ¶ 60.) However, plaintiff
does not dispute that she refused to offer her arms to be handcuffed, and she stated in an online chat
that she resisted arrest. (Pl.'s 56.1 ¶ 55; Lucas Supp. Decl. Ex. 1.) Moreover, the video evidence in
the record makes clear that plaintiff was resisting arrest by trying to keep her hands free and to
avoid the officers' attempts to handcuff her. No reasonable juror could infer otherwise from the
evidence. (See Lucas Decl. Ex. M.) The Court thus concludes that, notwithstanding plaintiff's
assertions, there is no triable issue of fact as to whether she was resisting: she was, and no
reasonable juror could conclude otherwise. See Scott, 550 U.S. at 380 ("When opposing parties tell
two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury
could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion
for summary judgment.").

72; Lucas Decl. Ex. M.) Plaintiff's skirt had come up, and she attempted to pull her skirt down. (Defs.' 56.1 ¶ 73; Pl.'s 56.1 ¶ 73.) Officer Plevritis said to plaintiff, "You're going to get it again, you're going to get it again." (Defs.' 56.1 ¶ 74; Pl.'s 56.1 ¶ 74.) Plaintiff testified that she was warned that she would be pepper-sprayed a second time if she did not surrender her hands. (Defs.' 56.1 ¶ 75; Pl.'s 56.1 ¶ 75; Lucas Decl. Ex. F, at 54:21–24.) After pepper-spraying plaintiff a second time, the officers told plaintiffs to put her hands behind her back multiple times and to stop resisting. (Defs.' 56.1 ¶ 77; Pl.'s 56.1 ¶ 77.)[6]

After continuing to resist for approximately 20 seconds, plaintiff offered her arms to be handcuffed and allowed herself to be arrested in order to "regain [her] dignity and move on out of this current situation." (Defs.' 56.1 ¶ 78; Pl.'s 56.1 ¶ 78; Lucas Decl. Ex. F, at 56:01–10.) Plaintiff was in physical pain and did not want to be pepper-sprayed again. (Defs.' 56.1 ¶ 78; Pl.'s 56.1 ¶ 78.) After plaintiff was handcuffed, while she was kneeling on the ground with the officers holding her, she asked them to please pull her skirt down so before they lifted her up so that her lower body would not be completely exposed; Plevritis said, "No," and the officers pulled plaintiff to her feet. (Pl.'s 56.1 ¶ 149; Defs.' Reply 56.1 ¶ 149; Lucas Decl. Ex. M.) The officers then placed plaintiff in the police car and transported her to the First Precinct. (Defs.' 56.1 ¶ 84; Pl.'s 56.1 ¶¶ 84, 150; Defs.' Reply 56.1 ¶ 150.)[7]

---

[6] It appears from the video evidence that the officers pepper-sprayed plaintiff from within three feet of her face on both occasions. (Pl.'s 56.1 ¶¶ 152, 153; Defs.' Reply 56.1 ¶¶ 152, 153; Lucas Decl. Ex. M.) The City of New York Police Department Patrol Guide instructs service members using pepper-spray devices to use "two (2) one second bursts, at a minimum distance of three (3) feet." (Decl. of Joshua S. Moskovitz ("Moskovitz Decl.") Ex. 14, at D176, ECF No. 54.)

[7] The parties' dispute over the sequence of events that occurred after this point is immaterial to the Court's decision. (Pl.'s 56.1 ¶¶ 150, 151; Defs.' Reply 56.1 ¶¶ 150, 151.)

6

### 3. Plaintiff's charges

Plaintiff was ultimately arraigned on two charges: resisting arrest under New York Penal Law § 205.30 and disorderly conduct under New York Penal Law § 240.20(1) and (3). (Defs.' 56.1 ¶ 88; Pl.'s 56.1 ¶ 88; Moskovitz Decl. Ex. 12.)

Plevritis recorded plaintiff's arrest in his memo book as follows: "Female Black refuses to leave location and refuses to give ID[.] Female then resists arrest by flailing her arms and twisting her body. Pepper spray used 2x to restrain female." (Pl.'s 56.1 ¶ 99; Defs.' Reply 56.1 ¶ 99.) Naimoli prepared an electronic arrest report that stated that plaintiff "was asked to leave location after causing a disturbance in front of a store. Deft did refuse this order. . . . While effecting arrest deft did resist by pulling her arms and trying to push away from officers to prevent being handcuffed." (Pl.'s 56.1 ¶ 102; Defs.' Reply 56.1 ¶ 102.) The arrest report indicated one disorderly conduct provision as the basis for her arrest: Penal Law § 240.20(6), "refusing to move on." (Pl.'s 56.1 ¶ 88; Lucas Decl. Ex. N.)

Later in the evening, Assistant District Attorney ("ADA") James Lynch spoke with Naimoli and prepared a criminal complaint based on that conversation. (Pl.'s 56.1 ¶ 107; Defs.' Reply 56.1 ¶ 107.) The criminal complaint did not charge plaintiff with violating Penal Law § 240.20(6) and did not mention that plaintiff refused to leave or to provide identification. (Pl.'s 56.1 ¶ 88; Moskovitz Decl. Ex. 12, at D94.) Instead, the criminal complaint charged plaintiff with violating Penal Law § 240.20(1) and (3) for having "engaged in fighting and in violent, tumultuous and threatening behavior" and "used abusive and obscene language and made an obscene gesture in a public place" "with intent to cause public inconvenience,

7

annoyance and alarm and recklessly causing a risk thereof." (Id.) The complaint, which Naimoli signed under oath, alleged that Naimoli personally observed plaintiff "banging on the door of Starbucks and screaming" that she needed to use the bathroom, and that her conduct "caused a crowd to gather and people to express alarm." (Pl.'s 56.1 ¶ 103; Defs.' Reply 56.1 ¶ 103; Moskovitz Decl. Ex. 12, at D94.)

Plaintiff accepted an adjournment in contemplation of dismissal at her second court appearance. (Defs.' 56.1 ¶ 89; Pl.'s 56.1 ¶ 89.)

B.     Procedural History

On February 13, 2013, plaintiff filed her initial complaint. (ECF No. 1.) On July 9, 2013, plaintiff filed an amended complaint. (ECF No. 7.) On February 13, 2014, defendants filed the instant motion for summary judgment. (ECF No. 34.) The motion became fully briefed on May 2, 2014. (ECF No. 56.)

Plaintiff's complaint alleges the violation of plaintiff's First Amendment rights through retaliating against her for her expressive conduct (Compl. ¶¶ 47–55); the violation of her Fourth and Fourteenth Amendment rights through, inter alia, false arrest and imprisonment, excessive force, and inhumane conditions of confinement (id. ¶¶ 56–59); and various state-law claims, including violation of the New York State Constitution, assault and battery, intentional infliction of emotional distress, negligence, and negligent infliction of emotional distress (id. ¶¶ 64–84). Plaintiff has conceded her Fourteenth Amendment and conditions-of-confinement claims. (Pl.'s Mem. of L. in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp.") 1 n.1, ECF No. 49; Reply Mem. of L. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mot.") 1, ECF No. 56.)

8

## II.    STANDARD OF REVIEW

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the nonmoving party's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

III.    DISCUSSION

In light of plaintiff's concession of certain claims, the claims that remain in the case are plaintiff's Fourth Amendment false arrest claim, her Fourth Amendment excessive force claim, her First Amendment retaliation claim, and her state-law claims. For the reasons set forth below, defendants' motion for summary judgment is GRANTED as to each of these claims.

A.    Plaintiff's Fourth Amendment False Arrest Claim

There is no triable issue of fact as to whether the officers had probable cause to arrest plaintiff—they did. Probable cause here is based on the uncontested facts regarding the information that the officers knew at the time that they arrived at the

location and plaintiff's refusal to disperse. Accordingly, dismissal of plaintiff's false-arrest claim is proper.

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); see also Singer v. Fulton Cnty. Sherriff, 63 F.3d 110, 118 (2d Cir. 1995). Moreover, a "Fourth Amendment claim turns on whether probable cause existed to arrest for any crime. . . . Defendants prevail if there was probable cause to arrest Plaintiffs for any single offense." Marcavage v. City of New York, 689 F.3d 98, 109–10 (2d Cir. 2012) (emphasis added).

"Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Singer, 63 F.3d at 119 (internal quotation marks omitted). A "law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth. . . . The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed." Miloslavsky v. AES Eng'g Soc'y, Inc., 808 F. Supp. 351, 355 (S.D.N.Y. 1992) (citing Adams v. Williams, 407 U.S. 143, 146 (1972)), aff'd, 993 F.2d 1534 (2d Cir. 1993).

Based on the officers' knowledge at the time of their arrival and the events that occurred after their arrival, probable cause existed to arrest plaintiff for disorderly conduct. "A person is guilty of disorderly conduct when, with intent to

cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: . . . 6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse . . . ." N.Y. Penal L. § 240.20 (McKinney). The officers knew that Torres had called 911 because a group of people had been banging on the Starbucks door. (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.) Torres had informed the 911 dispatcher that people were "knocking on the door really really bad" and "making nasty comments." (Defs.' 56.1 ¶¶ 20–22; Pl.'s 56.1 ¶¶ 20–22.) Plaintiff was still standing outside the Starbucks when the officers arrived; she asked the officers where she could use a bathroom, and they directed her to leave the area and "go home." (Defs.' 56.1 ¶¶ 45, 46; Pl.'s 56.1 ¶¶ 45, 46; Lucas Decl. Ex. B, at 32:12–19, 34:17–20, Ex. F, at 43:8–13.) However, plaintiff decided to wait for Starbucks to open rather than leave the area, and she told the officers that she could not go home; she also stated in a later online chat that she "refused to move" from the Starbucks. (Defs.' 56.1 ¶¶ 47, 52; Pl.'s 56.1 ¶¶ 47, 52; Lucas Decl. Ex. F, at 43:17–22; Lucas Supp. Decl. Ex. 1.)

These facts were sufficient to form probable cause to arrest plaintiff for disorderly conduct for "congregat[ing] with other persons in a public place and refus[ing] to comply with a lawful order of the police to disperse." See N.Y. Penal L. § 240.20(6). A "person is guilty of committing disorderly conduct if he refuses to obey an officer's order to move, unless the order was purely arbitrary and not calculated in any way to promote the public order." Crenshaw v. City of Mount Vernon, 372 F. App'x 202, 206 (2d Cir. 2010) (internal quotation marks omitted).

Here, given the officers' prior knowledge that people had been banging on the doors refusing to leave, their instruction to plaintiff to go home was "lawful," N.Y. Penal L. § 240.20(6), and not "arbitrary," Crenshaw, 372 F. App'x at 206.

The parties' dispute over whether the officers spoke with Torres before they arrested plaintiff (see Defs.' 56.1 ¶¶ 36–40, 42; Pl.'s 56.1 ¶¶ 36–40, 42; Pl.'s Opp. 13–14) is irrelevant to the outcome of this motion. The officers had sufficient information to form probable cause from the 911 radio dispatcher, who undisputedly told the officers that Torres had called 911 from the Starbucks due to "six people banging on the doors refusing to leave." (Defs.' 56.1 ¶¶ 20, 29; Pl.'s 56.1 ¶¶ 20, 29.)

Based on the information known to the officers, probable cause also existed to arrest plaintiff for harassment. "Under New York law, '[a] person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person . . . [h]e or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose." Jaegly v. Couch, 439 F.3d 149, 152–53 (2d Cir. 2006) (alterations in original). The information that the 911 dispatcher communicated to the officers—that a group of people had been banging on a Starbucks door and refusing to leave (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶ 29)—was "reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Singer, 63 F.3d at 119. The fact that the officers did not witness plaintiff knocking on the Starbucks door is immaterial (Pl.'s 56.1 ¶¶ 93, 94; Defs.' Reply 56.1 ¶¶ 93, 94); the officers

received their information from Torres, a "putative victim or eyewitness" whose truthfulness the 911 dispatcher and the officers could assume. See Adams, 407 U.S. at 146; Miloslavsky, 808 F. Supp. at 355.

Finally, probable cause existed to arrest plaintiff for obstruction of governmental administration. "A person is guilty of this offense if he 'prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference . . . .' N.Y. Penal Law § 195.05. Refusing to obey orders to leave the premises can be the basis for an arrest for obstructing governmental administration." C.G. v. City of New York, No. 12-cv-1606 (ARR), 2013 WL 5774291, at *5–6 (E.D.N.Y. Oct. 24, 2013); see also Berger v. Schmitt, 91 F. App'x 189, 191 (2d Cir. 2004) (finding probable cause to arrest a person who refused to leave a scene for obstruction of governmental administration); Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995) (finding probable cause to arrest a person who refused to leave a car for obstructing governmental administration).[8] The officers here lawfully instructed plaintiff to "go home," but she refused to leave. (Defs.' 56.1 ¶¶ 45–47, 52; Pl.'s 56.1 ¶¶ 45–47, 52; Lucas Decl. Ex. B, at 32:12–19, 34:17–20, Ex. F, at 43:8–13, 43:17–22; Lucas Supp. Decl. Ex. 1.) Those actions were sufficient for obstruction of governmental administration.

---

[8] Plaintiff argues that "interference" within the meaning of N.Y. Penal L. § 195.05 must be physical interference." People v. Case, 42 N.Y.2d 98 (1977). Nonetheless, courts in the Second Circuit have found that a refusal to leave constitutes sufficient "interference" to rise to the level of obstruction of governmental administration. See, e.g., Berger, 91 F. App'x at 191; Lennon, 66 F.3d at 425; C.G., 2013 WL 5774291, at *6.

14

For these reasons, the Court grants summary judgment to defendant on plaintiff's Fourth Amendment false arrest claim.

B.     Plaintiff's Fourth Amendment Excessive Force Claim

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. . . "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 394–95 (1989) (citation and internal quotation marks omitted).  To sustain a claim for excessive force, plaintiff must show that the use of force is "objectively sufficiently serious or harmful enough to be actionable." United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999).

Plaintiff has failed to raise a triable issue on this claim.  In effecting their arrest of plaintiff, the officers took plaintiff to the ground and used pepper spray twice for approximately one second each. (Defs.' 56.1 ¶¶ 57, 69, 75, 77; Pl.'s 56.1 ¶¶ 57, 69, 75, 77.)  Throughout the arrest, the officers continually instructed plaintiff to stop resisting.  (Defs.' 56.1 ¶¶ 56, 64–66; Pl.'s 56.1 ¶¶ 56, 64–66.)  Plaintiff asserts that she was not resisting for the majority of the arrest; indeed, witnesses made several statements to that effect.  (Pl.'s 56.1 ¶¶ 64, 65, 72; Pl.'s Opp. 19.)  However, plaintiff also admits that she did not voluntarily offer her hands or arms to be handcuffed, and she stated in an online chat that she "resisted arrest." (Defs.' 56.1 ¶ 55; Pl.'s 56.1 ¶ 55; Lucas Supp. Decl. Ex. 1.)  Additionally, having carefully

15

reviewed the undisputed video evidence in the record (see Lucas Decl. Ex. M), the Court concludes that plaintiff was indeed resisting arrest; no reasonable juror could infer otherwise. Viewing the evidence in the light most favorable to plaintiff—as the Court must on summary judgment—does not require disregarding facts and the incontrovertible record. See Scott, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); Zellner, 494 F.3d at 371.

In light of these undisputed facts, the officers did not use excessive force, notwithstanding the fact that the officers arrested plaintiff for a violation rather than a crime. Balancing "the nature and quality of the intrusion on [plaintiff's] Fourth Amendment interests" (bringing plaintiff to the ground and using pepper spray twice, each time for approximately one second, after having repeatedly warned plaintiff) "against the countervailing governmental interests at stake" (the officers' attempt to arrest a plaintiff who was resisting) leads to the conclusion that the officers' use of force was reasonable. See Graham, 490 U.S. at 394–95; see also Crowell v. Kirkpatrick, 400 F. App'x 592, 595 (2d Cir. 2010) (finding that the use of tasers on arrestees who were resisting arrest was not excessive force); Tracy v. Freshwater, 623 F.3d 90, 97 (2d Cir. 2010) (finding that a police officer did not use excessive force in striking an arrestee with a metal flashlight, jumping on him, spraying him with pepper spray after he had been placed in handcuffs, and forcibly moving him from the ground to the police car). Because plaintiff was resisting

16

arrest and attempting to evade the officers' attempts to handcuff her, taking her to the ground and deploying pepper spray were reasonable under the circumstances.[9]

For these reasons, the Court grants summary judgment to defendant on plaintiff's Fourth Amendment excessive force claim.

### C. Plaintiff's First Amendment Retaliation Claim

To avoid summary judgment on her claim for First Amendment retaliation, plaintiff must raise a triable issue with regard to the following: "(1) [she] has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by [her] exercise of that right; and (3) defendants' actions effectively chilled the exercise of [her] First Amendment right." Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001). The undisputed facts require dismissal of plaintiff's First Amendment claim for several reasons.

As an initial matter, probable cause is a complete defense to plaintiff's claim of First Amendment retaliation. See Fabrikant v. French, 691 F.3d 193, 216–17 (2d Cir. 2012) (finding that the plaintiff's "claim[] of . . . First Amendment retaliation fail[s] because defendants had probable cause" to arrest and prosecute). For the reasons set forth above, the undisputed facts show that the officers had probable cause to arrest plaintiff for, inter alia, disorderly conduct.

Additionally, even assuming that plaintiff had an "interest protected by the First Amendment," the officers' actions were not "motivated or substantially caused

---

[9] The Second Circuit found that material issues of fact remained in dispute with regard to an officer's use of pepper spray in Tracy, 623 F.3d 90. However, that case is distinguishable, because the arrestee was "already in handcuffs and offering no further active resistance." Id. at 98. Here, by contrast, the undisputed facts and video evidence reflect that plaintiff was indeed actively resisting.

by [her] exercise of that right." Curley, 268 F.3d at 73. The events leading to her arrest occurred when she and Sagan went to find a bathroom; the only speech in which plaintiff engaged in the presence of the officers present was related to her search for a bathroom, her refusal to leave the area, and her subsequent arrest. (Defs.' 56.1 ¶¶ 8, 11, 12, 14, 45, 46, 52, 71; Pl.'s 56.1 ¶¶ 8, 11, 12, 14, 45, 46, 52, 71.) Plaintiff argues that her criticism of the officers' actions constituted protected speech. (See Pl.'s 56.1 ¶¶ 45, 46, 52, 88.) It is true that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." City of Houston v. Hill, 482 U.S. 451, 461 (1987). Additionally, plaintiff argues that her participation in Occupy protest activity prior to the officers' arrival constituted protected speech.

However, plaintiff proffers no evidence that "defendants' actions were motivated or substantially caused by [plaintiff's] exercise of [her First Amendment] right." Curley, 268 F.3d at 73. "Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." Id. The undisputed here facts show that plaintiff was arrested when she refused to disperse. Plaintiff argues that there is a "close temporal proximity between [plaintiff's activity protesting the eviction of Occupy demonstrators] and Defendants' adverse actions against" her. Webster v. City of New York, 333 F. Supp. 2d 184, 202 (S.D.N.Y. 2004). Plaintiff also asserts that it would have been clear to the officers that plaintiff was affiliated with Occupy due to several comments that the officers and Torres allegedly made. (Pl.'s Opp. 21–22.)

18

This is mere argument and speculation. Defendant Plevritis testified that he did not believe that the people outside the Starbucks were part of Occupy. (Defs.' 56.1 ¶ 81.) Plaintiff disputes Plevritis's credibility based on the circumstances and based on several comments that the officers and Torres made (Pl.'s 56.1 ¶ 81), but she proffers no specific evidence that her participation in Occupy factored into defendants' decision to arrest her—only argument to that effect. Summary judgment is therefore proper. See Hicks, 593 F.3d at 166 ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.").

Accordingly, the Court grants summary judgment to defendant on plaintiff's First Amendment retaliation claim.

D.    Qualified Immunity

"The doctrine of qualified immunity shields public officials performing discretionary functions from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." Bradway v. Gonzales, 26 F.3d 313, 317–18 (2d Cir. 1994) (citation and internal quotation marks omitted). "An arresting officer is entitled to qualified immunity . . . on a claim for arrest without probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree

19

on whether the probable cause test was met." Golino v. City of New Haven, 950
F.2d 864, 870 (2d Cir. 1991); see also Lennon v. Miller, 66 F.3d 416, 420–21 (2d Cir.
1995) ("An officer's actions are objectively unreasonable when no officer of
reasonable competence could have made the same choice in similar
circumstances.").

Because "it was objectively reasonable for the officer to believe that probable
cause existed," defendants are entitled to qualified immunity here, even if probable
cause did not actually exist. Golino, 950 F.2d at 870. The officers knew, via the 911
dispatcher, that Torres had called 911 because a group of people had been banging
on the Starbucks door. (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.) Moreover, the officers
directed plaintiff to leave the area and go home, but plaintiff decided not to leave
the area, and told the officers that she could not go home. (Defs.' 56.1 ¶¶ 45, 46, 51,
52; Pl.'s 56.1 ¶¶ 45, 46, 51, 52.) Thus, it was "objectively reasonable for the officer[s]
to believe that probable cause existed" to arrest plaintiff for disorderly conduct,
harassment, or obstruction of governmental administration based on the standards
set forth above. Golino, 950 F.2d at 870.

Qualified immunity insulates defendants from liability on plaintiffs' First
and Fourth Amendment claims. Therefore, those claims must be dismissed.

E.    Plaintiff's State-Law Claims

"The district courts may decline to exercise supplemental jurisdiction over a
[state-law] claim if . . . the district court has dismissed all claims over which it has
original jurisdiction." 28 U.S.C. § 1367. Thus, dismissal of plaintiff's state-law
claims is proper in light of the Court's grant of summary judgment on all of

plaintiff's federal claims. See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surerfooted reading of applicable law. Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); Valencia v. Lee, 316 F.3d 299, 304–05 (2d Cir. 2003) ("[T]he district court's retention of jurisdiction over the state-law claims was an abuse of discretion.").

### F.   The Officers' Alleged Perjury

Among her arguments, plaintiff asserts that the defendant officers have perjured themselves in the underlying criminal court documents as well as in the course of the litigation. (Pl.'s Opp. 9–12.) Plaintiff argues that the officers' alleged lack of credibility requires denial of summary judgment. In particular, Naimoli alleged in the criminal complaint against plaintiff that he personally observed her banging on the door of the Starbucks; however, he admitted in his deposition that this was not true. (Pl.'s 56.1 ¶ 103; Defs.' Reply 56.1 ¶ 103.) Naimoli also allegedly perjured himself by telling ADA Lynch that he was "informed" that plaintiff was banging on the Starbucks door. (Pl.'s 56.1 ¶ 106.)

Even if true, plaintiff's assertions about the officers' alleged perjury are irrelevant to the outcome of this motion. As set forth above, the officers had probable cause to arrest plaintiff for disorderly conduct given their knowledge that Torres had called 911 for people knocking on the door and refusing to leave, and given plaintiff's refusal to leave the Starbucks. See N.Y. Penal L. § 240.20(6); Crenshaw, 372 F. App'x at 206. Because the officers had probable cause to arrest

plaintiff, defendants are entitled to summary judgment regardless of the events surrounding the criminal complaint.  See Marcavage, 689 F.3d at 109–10 ("Defendants prevail if there was probable cause to arrest Plaintiffs for any single offense.") (emphasis added).

IV.    CONCLUSION

For the reasons set forth above, defendants' motion is GRANTED.  The Clerk of Court shall terminate this action.

SO ORDERED.

Dated:    New York, New York
          June 18, 2014

                                    _____
                                    KATHERINE B. FORREST
                                    United States District Judge